# CITY OF COLUMBUS *v.* MERCANTILE TRUST AND DEPOSIT COMPANY OF BALTIMORE.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF GEORGIA.

No. 41. Argued November 7, 8, 1910.—Decided December 12, 1910.

To furnish an ample supply of pure and wholesome water is the highest police duty resting on a municipality.

One contracting to furnish a municipality with an ample supply of pure water must at all times maintain his ability to meet the requirements of the contract, and a continuous supply of water is a vital part of the contract.

The maxim that he who seeks equity must do equity applies to one affirmatively seeking relief. It does not vest a court of equity with power to impose on a defendant terms as a condition for dismissing the bill where plaintiff wholly fails to prove his case, even if defendant has filed a cross bill for defensive relief.

Where a water company has wholly failed to live up to its contract and the municipality has determined by ordinance to erect its own plant, a court of equity cannot, in a suit brought by the water company to restrain the municipality on the ground of impairment of contract, require the municipality to purchase any part of the plaintiff's plant as a condition for dismissing the bill.

The enforcement of a municipal ordinance will not be enjoined as impairing the obligations of an existing contract at the instance of a complainant who fails to show that the contract has been complied with.

A mortgagee of contract rights has no greater right to restrain the enforcement of an ordinance on the ground that it impairs the obligation of the contract than has the contracting party himself.

Where the breach justifies the abrogation of a contract otherwise protected by the contract clause of the Federal Constitution, considerations of hardship, and the interests of creditors cannot prevail to set up and enforce that contract against the party having the right to treat the contract as ended.

Where the contractor under a municipal water supply contract wholly fails to furnish an adequate supply of pure water according to the

contract, the municipality has no adequate remedy at law; it may treat the contract as ended and a court of equity may enforce such rescission.

THE facts, which involve the constitutionality of certain ordinances of the city of Columbus, Georgia, are stated in the opinion.

*Mr. William A. Wimbish* and *Mr. T. T. Miller,* with whom *Mr. J. H. Martin* was on the brief, for appellant:

The contract conferred upon the Water Works Company no exclusive right to furnish the city and its inhabitants with water; and hence the construction by the city of its own water system would offend no constitutional principle.

The source of supply selected having proven deficient, and having been practically abandoned, the Water Company has no exclusive right to supply the city with water derived from another source. The city was therefore at liberty to seek another source in order to remedy these deficiencies. *Stein* v. *Bienville Water Supply Co.,* 141 U. S. 67.

Even if the contract was in all respects valid and binding the city has been absolved from its obligations thereunder by reason of the failures and defaults on the part of the Water Company.

Under conditions existing at the time, the city not only had the right, but was under the imperative duty in the exercise of its police power to make provision for an adequate supply of wholesome water. *Walla Walla* v. *Water Co.,* 172 U. S. 1; *Boston Beer Co.* v. *Massachusetts,* 97 U. S. 28; *Butchers' Union Co.* v. *Crescent City Co.,* 111 U. S. 746.

In this exercise of the police power of the city there was no injustice to the stockholders of the Water Company. *Nor. Pac. Ry. Co.* v. *Duluth,* 208 U. S. 583.

The opinion and order of the court that the decree in favor of the city should be made conditional upon the purchase of any part of the present water system is not founded upon the pleadings, and is beyond the jurisdiction of the

court, as being in violation of the right of private con-
tract. *Burke* v. *Davis*, 81 Fed. Rep. 907; *Rejall* v. *Green-
hood*, 92 Fed. Rep. 945.

The inconvenience or loss to the bondholders which
may result from the decree to which the city is entitled
cannot be considered by the court. *Woodruff* v. *Gravel
Co.*, 18 Fed. Rep. 753; *Attorney General* v. *Birmingham*, 4
Kay & J. 539; *Weaver* v. *Ureka Lake Co.*, 15 California,
274; *Hamilton Gas Light Co.* v. *Hamilton*, 146 U. S. 258;
*In re Brooklyn*, 143 N. Y. 596; *S. C.*, 166 U. S. 681.

It is only when the relief sought is discretionary that
the court may impose conditions. *Fosdick* v. *Schall*, 99
U. S. 235; *Kneeland* v. *American Loan & Trust Co.*, 136
U. S. 89. The city was not under obligations to purchase,
and the mere fact that it had an option to do so gives no
equity to the other party if it refuses to exercise such
option. *Farmers' Loan & Trust Co.* v. *Galesburg*, 133
U. S. 156, does not apply.

There is no contractual relation or privity of contract
between the city and the bondholders; so far as the city
is concerned they are mere volunteers seeking to protect
their own interests, and to preserve the value of their
security. If the city had the legal right to a rescission of
the contract as against the Water Company there is no
superior equity of the bondholders. *Farmers' L. & T. Co.*
v. *Galesburg*, 133 U. S. 159.

There is no such diversity of citizenship as will support
the jurisdiction on that ground. *Dawson* v. *Columbia Ave.
&c. Co.*, 197 U. S. 178; *Mercantile Trust & Deposit Co.* v.
*Columbus*, 203 U. S. 198. Whenever the want of jurisdic-
tion becomes apparent in the progress of the cause, the
bill should be dismissed. *Morris* v. *Gilmer*, 129 U. S. 315.

*Mr. Joseph Packard*, with whom *Mr. A. Morris Tyson*
was on the brief, for appellee:

The contract in this case has been violated by the city

of Columbus rather than by the Water Company; but the whole question is settled by the acceptance by the city of the modifications of the contract. *Gas Co.* v. *San Francisco,* 9 California, 453, 475; *Allegheny City* v. *Mc-Clurkan,* 14 Pa. St. 81; *Water Co.* v. *Neosho,* 136 Missouri, 498; *Waterworks Co.* v. *Creston,* 101 Iowa, 687; *Water Supply Co.* v. *Ludington,* 119 Michigan, 480; *Waterworks Co.* v. *Joplin,* 76 S. W. Rep. 969; *Owensboro Water Co.* v. *Duncan,* 32 S. W. Rep. 478; *National Waterworks Co.* v. *Kansas City,* 62 Fed. Rep. 853, 866; *Illinois Trust and Savings Bank* v. *Arkansas City,* 76 Fed. Rep. 271; *Beadles* v. *Smyser,* 209 U. S. 403.

The police power of a municipality cannot be invoked to modify or abrogate its contractual obligations; nor can it contravene the Constitution of the United States or infringe any right granted or secured by that instrument. *Jacobson* v. *Massachusetts,* 197 U. S. 25; Russell's Police Power of the State, §§ 53, 54, 66, 71, 86. *Hume* v. *Laurel Hill Cemetery,* 142 Fed. Rep. 552; *West Street R. R. Co.* v. *Chicago,* 201 U. S. 506; *N. Y. & N. E. R. R. Co.* v. *Bristol,* 151 U. S. 567; *Nor. Pac. Ry. Co.* v. *Duluth,* 208 U. S. 583, 596; *C., B. & Q. Ry.* v. *Drainage Commrs.,* 200 U. S. 561; *St. Paul, Minneapolis &c. Ry. Co.* v. *Minnesota,* 214 U. S. 497, do not apply to this case.

Police power cannot be exercised unless it has some fair tendency to accomplish, or aid in the accomplishment of, some purpose for which that power can be used. *Welch* v. *Swasey et al.,* 214 U. S. 91.

A court of equity has power to so mould its decree as to grant relief upon such terms as in its judgment satisfy the equities of the particular case. The equitable character of an option to purchase in a contract of this kind has been distinctly recognized. *Indianapolis* v. *Consumers' Gas Trust Co.,* 144 Fed. Rep. 640; and see, where a similar option to purchase was upheld in favor of the city as against the water company, *Fayetteville* v. *Water,*

*L. & P. Co.,* 135 Fed. Rep. 400; *Castle Creek Water Co.* v. *Aspen,* 146 Fed. Rep. 8; *Bristol* v. *Waterworks Co.,* 19 R. I. 413; *Water Supply Co.* v. *Braintree,* 146 Massachusetts, 482; *Water Co.* v. *Cherryvale,* 65 Kansas, 219; *Los Angeles* v. *Water Co.,* 177 U. S. 558, 583.

Where a case for relief is made in the bill, it may be given by imposing conditions on the complainant consistently with the rules of equity, in the discretion of the court. *Walden* v. *Bodley,* 14 Pet. 164; *Buchannon* v. *Upshaw,* 1 How. 56, 84; *Kneeland* v. *American Loan &c. Co.,* 136 U. S. 89; *Thomas* v. *Brownville &c. R. R. Co.,* 109 U. S. 522; *Bourke* v. *Hefter,* 202 Illinois, 321; *Lockhart* v. *Leeds,* 195 U. S. 437; *Knoxville* v. *Water Co.,* 212 U. S. 1, 18.

The legislation impaired the obligation of the contract in this case; see 203 U. S. 311. *Water Co.* v. *Defiance,* 191 U. S. 184; *Dawson* v. *Columbia Ave. &c. Co.,* 197 U. S. 178, have no application to this case.

MR. JUSTICE LURTON delivered the opinion of the court.

This is a bill by the trustee under a mortgage made by the Columbus Water Works Company upon its plant and franchise to secure an issue of bonds, to enjoin the municipal authorities of Columbus, Georgia, from constructing and operating a municipal water system, thereby impairing the obligation of a contract between the city and the water works company granting to the latter for a term of thirty years an exclusive right to maintain a water works system in the streets of the city.

The bill, in substance, avers, and the answer admits, that the city has procured from the legislature of Georgia authority to construct and operate a municipal water plant and to issue the bonds of the city for that purpose, and that in pursuance of this legislative authority ordinances have been passed providing for the construction

of such water works and for the issuance of bonds to provide the means, and that notice of that purpose, and that the city no longer regards the contract with the Columbus Water Works Company as binding or obligatory, has been given.

The material defenses are, first, that the city had no power to make an exclusive contract; second, that the contract for rental of hydrants created an aggregate indebtedness prohibited by the constitution of the State; and, third, that the water works company had not kept its contract in respect of the character or capacity of the plant it was to provide and maintain, and has failed in its obligation to furnish an abundant and constant supply of pure and wholesome water, thus compelling the municipality to construct a system of its own for the protection of the health and property of its inhabitants.

These defenses were relied upon in the answer of the city as a defense against the injunction sought by the complainant and were made the subject of a cross bill against the complainant and the water works company, praying relief against the contract as having been first broken by the company.

Prior to the filing of this bill the same complainant had filed its original bill in the same court against the Columbus Water Works Company, praying a foreclosure of its mortgage, a default having occurred. The bill referred to was filed December 22, 1902. The present bill was not filed until July 30, 1903. One of the allegations of the foreclosure bill was "that during the continuance of this deed of trust the said party of the first part will not do or suffer to be done any act or acts whereby the security of the said bondholders shall be in any way or manner or in any amount impaired, and that the said party of the first part will at all times preserve, maintain and keep its waterworks, pumps, machinery, reservoirs, piping, hydrants and equipments in good repair, working order and condition

and supplied with all the machinery, equipments and appliances for providing water to the city of Columbus and vicinity and shall and will from time to time make all needful and proper repairs, renewals and replacements and useful and proper alterations, additions, betterments and improvements.

"3. That your orator is informed that for more than six months last past the Columbus Water Works Company has suffered the security of the bondholders to become impaired by not maintaining and keeping its water works supplied with all the machinery, equipments and appliances for providing water to the city of Columbus and vicinity, and by not making useful and proper additions, betterments and improvements to said water works. Further explaining the foregoing allegation your orator states that, owing to an unprecedented and protracted drought the sources of supply of water for the said water works have to a large extent failed for the time being; that it is within the power of the said water works company to provide for such a contingency by seeking and availing itself of other sources of supply, but that, as your orator is informed, owing to the attitude of the city of Columbus, which now is taking steps to provide a water supply of its own, the Columbus Water Works Company is unable to sell its bonds reserved in its treasury for such purposes and which could have been sold except for the attitude of the said city and therefore is unable to carry out the betterments and improvements in its water supply above mentioned."

Under that bill, which was unopposed, a receiver was appointed, who has ever since been in possession and is still operating said works. Upon application of the mortgage trustee and by consent of the bondholders and of the company, receiver's certificates have been issued to the extent of $50,000, and expended in repairing and improving the supply of water and the distributing system.

There has never been any consolidation of the two suits, but by an amended bill in the present case filed October 15, 1903, the fact of the pendency of the aforementioned foreclosure bill and the action had thereunder was stated. It was also averred in this amendment that by means of the receiver's certificates issued in the foreclosure case such improvements and enlargements had been made in the plant of the company that the receiver was then supplying an abundance of wholesome water, and that the trustee by direction of the bondholders was willing to expend such other sums as should be found necessary to enable the mortgagor company to carry out its contract.

Upon the bill as thus amended, the answer and cross bill and the answer thereto, and upon *ex parte* affidavits the court heard a motion for an injunction *pendente lite*. Upon that hearing the court disposed of two legal defenses arising upon the face of the contract, namely, whether a contract extending over thirty years for the rental of hydrants was the creation of an indebtedness for the aggregate of the rental, and second, whether the city had power to make an exclusive contract. Both of these questions were decided by Judge Newman against the city. On November 19, 1903, an injunction pending the suit was allowed, and the cause referred to a special master to take proof and report his findings of law and fact in respect of the issues with reference to the failure of the water works company to comply with its contract. See 130 Fed. Rep. 180.

On January 23, 1904, the city filed its petition praying a dissolution of this injunction, alleging that a great amount of evidence had been taken by the special master, and that the reservoir had again failed, and that water was now being taken from the Chattahooche River, and that the water at the intake was polluted by reason of the fact that one of the city's sewers emptied into the stream

a short distance above the intake, and also that a polluted branch which drained a suburb of the city emptied into the river a short distance above the river intake. Thereupon, on January 25, 1904, the preliminary injunction was dissolved.

The special master, on November 19, 1904, filed a full, elaborate and able report with findings of fact and law. Upon the material questions he found in favor of the contentions of the city in respect to both fact and law. His findings of fact, as condensed by him, which are material to be here set out, are as follows:

"I have found that acceptance by the city was based on statement of the water company that the system had been completed in compliance with the contract, and upon assurances by the company that the water would be wholesome, abundant and lasting.

"I have found that the system as accepted by the city in 1882 had not met the general requirements of the contract, and that on complaints to the company the system had been improved to such an extent that in 1889 the service was at that time accepted as satisfactory to the city.

"That from 1889 to May, 1900, there was dissatisfaction and complaints on the part of the city because of insufficiency of water supply, and especially with the unsupplied needs of the city for water in its newly acquired territory; that the company had notice of this and recognized the necessity of increased water supply; that during this period the city through its council twice made an effort to repudiate the contract, but were not sustained by the requisite popular vote on submission of the question to the people; that the company in good faith endeavored to adjust the differences by offer to arbitrate and the city declined the offer; and that finally the city accepted the existing conditions and concluded a supplemental agreement by which the company was given an opportunity to test its ability to carry out the requirements of the contract; that

the company failed in this, and that in 1902 both the council and the people determined to no longer depend upon the water company.

"That the water company has at no time complied with section III, requiring a reservoir of 125 million gallons available supply, and from 1884 it has failed to comply with the requirements of section XII as to the construction and maintenance of the reservoir.

"That paragraph XI as to filtration has not been complied with on the part of the company.

"That the company has failed to comply with section V of the contract as to distribution in not connecting together the ends of its system and placing mains sufficiently large to at all times give full supply of water.

"With reference to the supply of water, I have found that the company has failed to comply with sections I and X in that sufficient supply of wholesome, constant and ample water has not and cannot be furnished from the source of supply as selected, nor is the same sufficient to meet the wants of the city and private consumers for present and future requirements.

"I have found that the company has not complied with section IV as to supply main.

"That as to pressure from 1893 to 1902, the pressure was variable and uncertain; that the gravity plan could not sustain it to the requirements of the contract, and that the standpipe and pumping devices adopted to assist it, while practically beneficial, were not at all times satisfactory; that the company has not met the requirements of section XXVII in maintaining pressure at 32 pounds, nor supplemental contract requirement of 40 pounds, and that in fires of any magnitude the pressure and water supply is insufficient, and that the supply is not ample for fire protection, as required by section IX, and that the receiver by improvement of the pumping station has greatly bettered conditions.

"With reference to the wholesomeness of the water as required by section X, I have found that the reservoir water, when available, is, under normal conditions, a wholesome water, but when the water is low it is not wholesome; that prior to July, 1902, the water furnished by the company was, with few exceptions, within the requirements of the contract, and in these exceptions the city has not availed itself of the provisions of section XIII of the contract to correct impurities; that since July, 1902, the company has not furnished a constant supply of wholesome water, nor has the receiver been able to do so; that the Chattahooche River cannot be relied on as a constant source of supply for wholesome water, but only so when, on a normal flow of the river, water is taken from points above all possibility of contamination and properly filtered.

"That the company has not been able, for want of available funds, to maintain and improve its system as the growth of the city demanded, and that extensions since 1891 have, from time to time, been, with the exception of a small amount, paid for by a necessary increase of a bonded indebtedness originally out of proportion to the earning capacity of the system, and constantly growing further beyond the ability of the system to maintain; that the system has not been reinforced and strengthened as its needs require, and that the owners of the bonds of the company recognized this fact.

"That the actual amount expended by the receiver to January, 1904, on betterments is $42,220.85."

To the findings of fact the complainants excepted.

Upon a final hearing the court, while not fully agreeing with the master as to the effect of the original acceptance of the works as constructed and as to the effect of subsequent acceptance of enlargements, repairs and improvements made by the company, from time to time, to meet complaints as to quantity and quality of water, concurred fully in the master's report that the company had not

complied with its obligation to construct and maintain adequate means for continuously furnishing an ample and wholesome supply of water for public and domestic purposes. Among other things upon this vital aspect of the case Judge Newman said:

"In my judgment the facts in evidence were sufficient to justify the master in finding that there was a failure on the part of the company to furnish a sufficient supply of pure and wholesome water as provided in the contract, and finding the company had failed in this respect. It is a serious matter to undertake to supply the inhabitants of a city with an ample supply of good and wholesome water, and persons entering into a contract to do this necessarily must do so with an understanding of the important character of the undertaking. This is particularly true of a growing city. Taking this whole record together and considering all the evidence, the master, as has been stated, was justified in reaching the conclusion that there was a failure to comply with the contract in this respect."

Although there was a concensus of finding by master and court that there was an obligation upon the water works company to furnish an adequate and continuous supply of pure water and that the water works company had therefore broken this vital part of its agreement, yet the court ruled that the city should be denied rescission under its cross bill and affirmatively restrained from establishing its own system, unless it "should do equity to the bondholders," by whose money the plant had been constructed, by purchasing "so much of the water works plant as may be hereafter determined, at a fair valuation as a condition of and before entering a decree in its favor finally denying an injunction in the case against the issuance by the city of its water works bonds." Time was given the city to determine whether it would accept the conditions imposed by purchasing at a fair valuation

such parts of the system as the court should determine
were usable by the city at a price to be fixed by a subse-
quent decree. The city declining to assent to such a con-
dition, an injunction was granted permanently restraining
the city from the construction of its own plant and dis-
missing the cross bill, and taxing all of the costs to the
city.

Pretermitting any opinion as to whether the contract
for rental of hydrants for a term of thirty years constituted
an aggregate indebtedness prohibited by the constitution
of the State of Georgia, as well as the question of the power
of the city to obligate itself by a contract excluding it
from constructing and operating its own water works, and
assuming, for the purposes of this case, that the contract
between the city and the water works company was per-
fectly valid, we come at once to the question of whether
the court below was right in denying relief under the cross
bill, and in granting the relief prayed by the original bill,
because the city declined to purchase at a price fixed by
the court or by arbitration the usable parts of the water
works system.

The primary and vital obligation of the company was
to furnish an adequate and constant supply of water for
both public and private use, which should be pure and
wholesome. By the first and second clauses of the con-
tract the company obligated itself to provide "all the
real estate, rights of way, water rights and water, that
shall be found requisite for the successful prosecution
and operation of the water works," and to supply "dams
and embankments of ample size and strength, good and
durable quality, that may be required for the works."
By the third clause it bound itself to construct "a storage
reservoir having an available capacity for the storage
and supply of not less than 125 million gallons." This,
in passing we may observe, was never done, and the in-
sufficiency of the reservoir capacity was one of the fac-

tors in the subsequent failure to furnish at all times an
adequate supply of water. By the tenth clause of the
contract it was provided that "the source of water supply
shall be determined by Thos. R. White (who assigned
to the Columbus Water Works Company), he guarantee-
ing, however, that the supply of water, both in quality
and amount, shall be wholesome, constant and amply
sufficient to meet the wants of the city, and private con-
sumers for future and present requirements." The elev-
enth and twelfth clauses related to the construction and
maintenance of a filter and to the maintenance of whole-
some conditions at the storage reservoir.

The single object of the agreement was to obtain a
constant and adequate supply of wholesome water. This
was guaranteed in express terms, to say nothing of the
necessary implication from the character of the contract.
This guarantee was a continuing one, and dominated every
other detail of the agreement. The company selected its
own source of supply, and was under the highest obligation
to continuously furnish an ample supply for all purposes
of water, which should be wholesome, that is, clean, pure
and fit for domestic use. This supply was to be adequate
not only for the demands of the present, but ample to meet
the demands of the future.

No higher police duty rests upon municipal authority
than that of furnishing an ample supply of pure and whole-
some water for public and domestic uses. The preserva-
tion of the health of the community is best obtained by
the discharge of this duty, to say nothing of the preserva-
tion of property from fire, so constant an attendant upon
crowded conditions of municipal life. If a municipality
elect to contract with another for the discharge of this
function, it is under the greatest obligation to require
that the contractor shall engage to construct and main-
tain adequate means and furnish an adequate supply, in
quality and quantity, to at all times meet the public ne-

cessity. So, too, the contractor must satisfy himself as to the sufficiency and quality of the source of supply, and maintain adequate storage and distributing instrumentalities to meet conditions. That his source of supply is at times adequate and wholesome is not enough. The wants of the public must, under all conditions, be supplied. We do not take account of temporary and unusual conditions which cannot be reasonably foreseen. But that which can be and should be foreseen must be taken into account by a private contractor who undertakes so vital a function as that of supplying water to a growing community.

The continuing character of the obligation to furnish an adequate supply of wholesome water, as we have before suggested, is not met by showing that such a supply has been furnished at times, nor is the non-performance of the agreement excused by the occurrence of conditions which are likely to occur in a climate of long dry summers. Nor is such a contract fulfilled by showing that at the time of completion of the works the company was able to carry out the contract. Ability to carry out the agreement must be maintained. From time to time during the operation of the works specific complaints were made by the city in consequence of the failure of the water company to furnish an adequate supply of water, or on account of the quality of the water or insufficient pressure. These complaints generally resulted in an effort to remedy the matter, and more than one change and improvement made seemed to produce good results, leading the municipality to accept for the time the repair, or enlargement, or change as meeting the necessities of the particular exigency, and giving promises of ability to carry out the contract. In consequence of such efforts to improve the service in quantity and quality of water supplied, the electorate of the municipality twice voted against a bond issue to construct a municipal plant, manifesting thereby

a willingness that further opportunity should be given
the company to show its ability to bring its plant up to
the requirements of the contract. Indeed, the attitude
of the city and its people toward the water company as
shown by the record seems to have been forbearing and
generous. This acceptance of improved conditions re-
sulting from complaints has been relied upon as estopping
the city. But no such result may rightfully follow, unless
such improved conditions resulted in the maintenance
thereafter of a continuous, adequate supply of wholesome
water. This was not the case. Want of capital may have
been the cause for adoption by the company of expedients
to meet a particular exigency which were inadequate to
permanently overcome a radically insufficient source of
supply, as well as insufficient storage and filtration instru-
mentalities. The relief resulting from all that was done
by the company or its receiver was not abiding nor the
character of the water permanently improved. That the
works were not able to come up to the requirements of
the contract and not able to meet the reasonable neces-
sities of the city was a question of fact, upon which the
master and the court have agreed. The contract to fur-
nish an adequate supply of water of good, usable quality
was, as we have already said, a continuing and vital part
of the contract. Touching a similar contract this court,
in *Farmers Loan and Trust Co.* v. *Galesburg*, 133 U. S.
156, 170, said:

"Whether or not the water company was able to fur-
nish the required quantity of water every twenty-four
hours, and whether or not its quality as to purity and
goodness for domestic and other uses was in compliance
with the ordinance, must rest upon facts as proved to
exist. Moreover, the estoppel, so far as it did exist, was
not a continuing one. The obligation of the water com-
pany to furnish the quantity and quality of water required
by the contract was a continuing obligation, and was not

met once for all by a compliance with the fire test of December 6, 1883. The right of the company to enjoy the consideration of the contract was thereafter to depend upon its continuing to perform it. There was not and could not be a final and absolute acceptance of the water works by the city, without regard to a future compliance on the part of the water company with the requirements of the contract. The case was not one of works constructed for the city, and to become its property upon acceptance; and the acceptance related merely to the sufficiency of the structures for fire service at the time."

There remains then the simple question as to whether the Circuit Court was justified, upon a finding that the water company had not and was not able to do what it agreed to do, in restraining the city from meeting the plain necessities of the case by constructing and operating its own plant, because the city would not accept as a condition the purchase at a price fixed by the court of so much of the water works plant as the court should be of opinion it could use in its own system. If, as is manifestly the case, the water works company has not complied with its contract in vital particulars, the city had the legal right to say, as it did in substance say, "you have failed to maintain a continuous and adequate supply of water fit for domestic purposes, as you were bound to do. Public considerations of the highest obligation require that the city and its inhabitants shall have a continuous water service adequate to the preservation of the public health and the public safety. We therefore shall treat the contract as at an end and undertake this function by means of a municipal plant."

However serious the result to the water company, or its creditors, the plain law of the case was with the city. The bondholders had neither legal nor equitable rights superior to the contract between the city and the water company. If the latter had not complied with the con-

tract after repeated experiments and much indulgence by the city, what is the equitable foundation for the enforcement of a broken and continuing obligation by enjoining the city from doing what it had a plain legal right to do if the water company was unable to carry out the contract upon its part? Nevertheless, the learned judge, after reaching and announcing the conclusions already stated as to the facts of the case, granted to the complainant the full equitable relief sought, because the city declined to agree to conditions imposed. The court justified the imposition of conditions under the maxim that he who seeks equity must do equity. But this maxim is one which applies to him who affirmatively seeks equitable relief.

The complainant had, beyond serious doubt, failed to make a case entitling it to relief. But the court in substance said to the city, that unless the city would agree to mitigate the injury and loss which must come to the creditors of the defaulting company by buying so much of the company's plant as the court should think adapted to use in the plant to be constructed by the city, that a decree should go for the complainant, although it had failed to make a case entitling it to the enforcement of the contract between the company and the city. Manifestly the maxim cannot vest in the chancellor the power which has been exercised. It is true that the city by a cross bill asked to have the contract declared at an end for non-performance. But this was defensive relief. If the complainant had shown a valid contract which was impaired by the legislation providing for a construction of rival water works, it was clearly entitled to a decree enjoining the city from proceeding with the construction of a municipal system. In that event the cross bill would be dismissed as a necessary result of such decree upon the original bill. But if complainant failed to show a state of facts which entitled it to restrain the city from

doing anything in impairment of the contract between it and the. mortgagor water company, the only logical result was a decree .dismissing the original bill because the city had not kept its contract, and a decree under the cross bill declaring the contract abrogated rightfully by the city as a consequence of its breach in vital particulars.

A consideration of the consequence to creditors of the contracting company is not an answer to the legal rights of the city. Considerations of hardship cannot prevail to set up and enforce a broken agreement, which in law results in giving to the opposite party a right to treat the agreement as ended. *Hamilton Gas Light Company* v. *City of Hamilton,* 146 U. S. 258; *Atty. Genl.* v. *Council of Birmingham,* 4 Kay & J. 539; *Kneeland* v. *American Loan & Trust Co.,* 136 U. S. 89. In the case of *Atty. Genl.* v. *Council of Birmingham* the Vice Chancellor said: "I am not sitting here as a committee of public safety, armed with arbitrary power to prevent what it is said will be a great injury not to Birmingham only but to the whole of England; that is not my function."

The city should be left its freedom of contract in respect to buying such parts of the company's plant as it can profitably use.

The remedy by an action for damages was wholly inadequate to the city. The city had a right to treat the contract as terminated, and to invoke the aid of a court of equity to enforce its rescission. 133 U. S. 156, 179.

Reverse the decree and remand with direction to dismiss the bill and grant the relief as prayed in the cross bill.

*Reversed.*