Charles **TAYLOR** and Ruth Taylor, Plaintiffs and Respondents,

v.

The **CITY OF DEVILS LAKE**, a Municipal Corporation, Defendant and Appellant.

No. 7700.

Supreme Court of North Dakota.

Jan. 6, 1958.

Rehearing Denied Jan. 30, 1958.

Clyde Duffy, Devils Lake, for appellant.

Erickstad & Foughty, Devils Lake, for respondents.

SATHRE, Judge.

The plaintiffs in this case own and operate a Coast to Coast hardware store in the City of Devils Lake at 308 Fourth Street. In their business they carry a general line of hardware and other merchandise such as automobile tires, washing machines, package goods and many other items of different types and description. The basement of the building which they occupy is equipped with shelving and is used for storage of the general items of merchandise which they carry in stock for sale. They brought this action for damages against the City of Devils Lake alleged to have been sustained by reason of the negligent failure of the city to maintain the water mains in the water distribution system owned by the city in proper repair, and that on the 22nd day

of June 1956, a water main broke in front of the plaintiff's place of business permitting the water to seep through the ground into the plaintiff's basement and damaging and destroying a large quantity of merchandise stored therein. The complaint alleges that notwithstanding the plaintiffs gave due and timely notice to the city and its officers of the break in the water main the city negligently failed to shut the valves to stop the flow of water into the basement and that by reason of the negligence on the part of the city and its officers the basement of plaintiffs' place of business was flooded and that large quantities of merchandise stored therein were destroyed and damaged to the damage of the plaintiffs in the sum of $3,884.98.

The defendant city answered by way of general denial, specifically denying that the damages sustained by the plaintiff were due to any negligence on the part of the defendant. It admits that a break occurred in one of the water mains as alleged in the complaint and that plaintiffs suffered some water damage but denies that such damage was due to any negligence on the part of the defendant. The answer further alleged that:

"It purchased the water system of Devils Lake from Otter Tail Power Company about August 1, 1955, but in this connection alleges that the reason for such purpose [purchase] was to provide adequate fire protection for the City of Devils Lake. That prior to such purchase a survey disclosed that the water pressure was wholly inadequate to provide protection for the North Dakota School for the Deaf or for Mercy Hospital and that it proved impossible to work out an arrangement whereby Otter Tail Power Company could provide such needed fire protection. That thereupon an arrangement was worked out whereby the State of North Dakota contributed to the building of certain large water mains and a water tower and to carry out such arrangement the defendant purchased

and took over the operation of such water system and that the defendant operates the same in its governmental capacity."

The case was tried to a jury in the district court of Ramsey County in the City of Devils Lake, North Dakota, in December 1956. At the close of all the testimony, when both parties had rested, the defendant moved for a directed verdict in its favor upon the following grounds:

1. That the undisputed evidence establishes that the City of Devils Lake was at the time of the incident involved in this action and upon which liability is attempted to be predicated, engaged in a governmental function and is therefore exempt from liability of suit for damages.

2. That the evidence wholly fails to establish that the damages sustained by plaintiffs were the result of negligence on the part of the defendant, its officers, or employees.

The trial court denied the motion and submitted the issues to the jury. The jury returned a verdict in favor of the plaintiffs, and judgment was entered thereon. Thereafter in due time defendant made a motion for judgment notwithstanding the verdict or in the alternative for a new trial. The motion was made upon the same grounds as was the motion for a directed verdict. The motion was denied and defendant appealed from the order denying its motion and from the judgment.

It is the contention of the defendant that in operating and maintaining the water works of the city it was engaged in a governmental function, and that therefore it was not liable for the damages alleged to have been sustained by the plaintiffs.

■ The first question for consideration is whether the City of Devils Lake was functioning in a governmental capacity when the plaintiffs sustained the damages complained of. The general rule is that if a municipality is engaged in a governmental function it is not liable for damages re-

sulting from negligence of its officers and employees. In the case of Holgerson v. City of Devils Lake, 63 N.D. 155, 246 N.W. 641, 642, this court said:

"Under the rule established in this jurisdiction, 'a municipality is not liable for the tort of its agent committed in the course of the performance of a governmental duty, nor for the manner in which it exercises its governmental authority, nor for the failure to exercise it properly'. Hanson v. Berry, 54 N.D. 487, 209 N.W. 1002, 47 A.L.R. 816."

In the case of Belt v. City of Grand Forks, N.D., 68 N.W.2d 114, 119, this court said:

"The defendant maintains that it is immune from liability for negligence in the exercise of a governmental function. The governmental function theory absolves a municipality from a liability for negligence in the performance of a governmental function, power or duty which it is authorized to perform. This theory has been recognized in several cases in this court."

To the same effect is Burkard v. City of Dell Rapids, S.D., 72 N.W.2d 308, 309. We quote from the opinion:

"It is a settled principle that with respect to liability for tort a municipal corporation has a dual character. It is immune from liability when exercising powers of a governmental character, but liability for tort ordinarily attaches when exercising a corporate or proprietary function."

■ It appears from the evidence that prior to August 1, 1955 and for 50 years or more, the Otter Tail Power Co. of Fergus Falls, Minnesota, owned and operated the water distributing system of the City of Devils Lake. The city had dug and maintained several artesian wells which furnished water for the system. The water from these wells was not potable, at least was not desirable for domestic use, and the city authorities had on different occasions discussed the matter of obtaining potable water from other sources than from the artesian wells. However no official action was ever taken for such purposes.

On August 1, 1955 and prior thereto the water system of the city consisted of the water mains and feeder pipes to the users, and an elevated storage tank with a capacity of 100,000 gallons.

It is established by the testimony of the city commissioners and the superintendent of the water department that the system as it existed on August 1, 1955 was capable of furnishing water sufficient for the ordinary and necessary use by the residents of the city. The problem confronting the city commission, however was the matter of fire protection. The evidence shows that a survey conducted by the fire underwriters indicated that there was not sufficient water, or main capacity to provide adequate fire protection for the State School for the Deaf and Mercy Hospital which are located in the City of Devils Lake. On March 4, 1955 the city commission received a letter, defendant's exhibit 10, from Mercy Hospital stating that it would be unable to secure a license to operate for the current year unless a sprinkler system was installed at the hospital for fire protection, and that in order to be eligible for a license it had to be assured by the city that action would be taken to provide such fire protection. The City Commission thereupon employed a consulting engineer to make a survey and to make a report and recommendations as to the necessary steps to be taken to secure adequate fire protection.

The consulting engineer, Mr. L. W. Burdick of Grand Forks, N. D. made a survey of the water system of the city, made his recommendations and prepared plans and specifications for improvement of the water system which included construction of feeder mains and an elevated tank of 500,-000 gallon capacity which would be required to insure sufficient pressure for fire

protection. The Otter Tail Power Company declined to incur the expense of making these improvements, but was willing to sell the water system to the City of Devils Lake. After due consideration negotiations were completed for purchase by the City of Devils Lake of the water system for a consideration of $128,162.00 and the city took possession on August 1, 1955.

The City Commission accepted the plans and specifications prepared by the consulting engineer and proceeded to advertise for bids and let contracts for construction of the improvements to the water system involving expenditures as follows:

| | |
|---|---|
| Elevated water tower | $108,750.00 |
| New trunk mains | 135,308.00 |
| Purchase price of system | 128,162.00 |
| Engineering etc., | 39,780.00 |
| Total cost | $412,000.00 |

The 1955 Legislative Assembly of North Dakota appropriated $75,000 towards the project leaving the net cost to the city at $337,000.

With reference to the purchase by the City Commission of the water distribution system, Mr. Dennis Kelly who had been chairman of the City Commission since 1950 testified as follows:

"Q. And now coming up to the winter of 1954 and 1955, when this matter of taking over the system and putting in some new larger water mains and a water tower, did that have any connection with the water project, whatsoever? A. Oh, no. As far as most people in this town that Warwick deal had been abandoned.

"Q. What was the purpose of the water tower and the new mains? A. Well the Fire Underwriters Inspection Bureau of Fargo were constantly calling attention to the lack of fire protection, and I—we had received these letters which I think were shown yesterday, and we were forced to do something for fire protection.

"Q. And was that the purpose— was that the matter that was discussed at various city commission meeting what it was under consideration? A. Absolutely."

Mr. Paul Oien, the Water Commissioner, testified as follows with reference to the reason why the city undertook to purchase and enlarge the water system:

"A. We asked them (Otter Tail Power Co.) to resubmit a new figure on the purchase of the water system, so that we could, the city themselves could go into added expense and provide additional fire protection for these people, and then shortly after that we also had a meeting of the City Commissioners with the Board of Administration of the Deaf School, and they had same problem. They did not have sufficient water up to protect them in case of fires, which was very serious. Have some buildings up there what was a real firetraps. That is background of water system. It was at that particular time. I felt, and so did the rest of the commissioners, it was fire protection we were after in purchasing the system. At a future date additions could be made to give the city potable water.

"Q. And what was the purpose of the new water tank? A. It was to provide an overhead storage of sufficient capacity to permit the pumper to draw water at a sufficient pressure to protect any building against fire in the City, including the hospital and deaf school.

"Q. And as far as ordinary use, I mean supplying water and ordinary use, was it the feeling of the commissioners that that new addition was necessary or otherwise?

"Q. I believe the evidence shows there is—that there was a, tank holding, I believe 100,000 gallons of water, is that correct? A. Yes.

"Q. What was the feeling of the City Commissioners with reference to sufficiency or insufficiency of that old tank insofar as the ordinary use of water was concerned, aside from fire protection? A. Well for strictly for use of people for their ordinary household use the old tank would probably supply sufficient pressure to take of it for just ordinary use, and also as far as quantity was concerned, but if (we) had major fire or needed strong pressure it was felt it was very insufficient in size."

It appears clear therefore that the main consideration of the city commission in purchasing and enlarging the water system was to secure adequate fire protection.

The construction of the elevated water tank had been completed some time prior to June 22, 1956. On that day at about 1 o'clock P.M. Mr. Austin Chisholm, superintendent of the water department, decided to fill the tank in order to test it for leaks. The tank was located in the north section of the city. A pump with a capacity of 1,000 gallons per minute, located near the Great Northern tracks on the south side of the city was used to force the water through the system and into the tank, as greater pressure than ordinarily required for normal use was necessary to force the water into the tank. At about 4:30 in the afternoon a water main had broken in front of the Ramsey Bank, adjacent to plaintiffs' place of business, and water was coming up through the pavement. About the same time, Mrs. Taylor, one of the plaintiffs, discovered that water was seeping into the basement of their store, and she immediately notified her husband. She next called the city auditor's office, the city engineer, and the fire department. These calls were made between 4:30 and 5 o'clock. The street department had closed the main

valves, but the water was still seeping into the basement.

The fire department arrived at about 5 o'clock P.M. and immediately started pumping water out of the basement with a 1000 gallon per minute pump; and one Ted Kemis a contractor also arrived and began pumping out water with an 8,500 gallon per hour pump. Both of these pumps were operating at the same time. Some difficulty was experienced in getting the gate valves fully closed and one or two were not fully closed until 7:30 or 8 o'clock P.M. The place of the break in the main was located by the contractor Kemis at about 1:00 A. M. June 23 and he immediately proceeded to repair it.

The plaintiffs introduced testimony from which it appears that during the eleven month period the water system had been owned and operated by the defendant city there had been sixteen breaks in the water mains which had been repaired by the city; that therefore the city was chargeable with knowledge of the deteriorated condition of the water mains and *that the city* was guilty of actionable negligence in failing to maintain the system in proper repair.

The question before us is whether the City of Devils Lake was acting in its governmental capacity at the time the basement of plaintiffs' store was flooded. In 63 C. J.S. Municipal Corporations, § 1051, pp. 668, 669 it is stated:

"It has been held that the furnishing of water by municipal corporation to its inhabitants is in no sense a governmental function, and is not a sovereign governmental function that cannot be delegated, although the supplying of water for purely municipal purposes, as distinguished from supplying private inhabitant consumers is a proper municipal function. As a general rule, however, the supplying of water by municipality to its inhabitants, or the construction or acquisition of a system of water supply, is held to be a, legitimate municipal affair, a municipal

purpose, a public municipal function, a generally recognized function of an incorporated city, and an essential governmental function; and the term 'city purpose' embraces the supply of water for municipal use and the establishment and maintenance of a fountain for watering animals. So, it has been held to be the duty of municipal governments to furnish their citizens with water, which is essential to the welfare of a city or compactly settled municipality."

In McQuillin Municipal Corp. Vol. 2, 3rd Ed. Sec. 1005, page 585 appears the following enumeration of governmental powers of Municipalities:

"Among the powers generally held to be governmental rather than private are the construction and maintenance of streets; conservation of public health; extinguishment of fires and making arrangements therefor; and power to legislate as to public utilities."

The case of Brush v. Commissioner of Internal Revenue, 300 U.S. 352, 359, 57 S.Ct. 495, 81 L.Ed. 691, 693, involved the question whether the salary of Brush, Chief Engineer of the Bureau of Water Supply of the City, is a part of his taxable income. His annual salary was $14,000. He exercised supervision over the engineering details connected with the supplying of water for public purposes and for consumption by the inhabitants of the city, and generally exercised control over the operation of the water system. The Federal Board of Tax Appeals held that his salary was taxable income, and its decision was affirmed by the Circuit Court of appeals. 2 Cir., 85 F.2d 32. On review by Writ of Certiorari to the Circuit Court of Appeals the judgment was reversed by the United States Supreme Court. In an opinion by Justice Sutherland the Court said [300 U.S. 352, 57 S.Ct. 498]:

"We are, of course, quite able to say that certain functions exercised by a city are clearly governmental— that is, lie upon the nearer side of the line—while others are just as clearly private or corporate in character, and lie upon the farther side. But between these two opposite classes, there is a zone of debatable ground within which the cases must be put upon one side or the other of the line by what this court has called the gradual process of historical and judicial 'inclusion and exclusion.' (numerous citations) * *

"We think, therefore, that it will be wise to confine, as strictly as possible, the present inquiry to the necessities of the immediate issue here involved, and not, by an attempt to formulate any general test, risk embarrassing the decision of cases in respect of municipal activities of a different kind which may arise in the future."

The opinion quoted with approval the following from City of Columbus v. Mercantile Trust & Deposit Co., 218 U.S. 645, 658, 31 S.Ct. 105, 109, 54 L.Ed. 1193, 1197:

"No higher police duty rests upon municipal authority than that of furnishing an ample supply of pure and wholesome water for public and domestic uses. The preservation of the health of the community is best obtained by the discharge of this duty, to say nothing of the preservation of property from fire, so constant an attendant upon crowded conditions of municipal life."

In conclusion the Court said:

"We conclude that the acquisition and distribution of a supply of water for the needs of the modern city involve the exercise of essential governmental functions, and this conclusion is fortified by a consideration of public uses to which the water is put. Without such a supply, public schools, public sewers so necessary to preserve health, fire departments, street sprinkling and cleaning, public buildings, parks, playgrounds, and public baths could not exist."

The decision in the Brush case, supra, was followed by the Supreme Court of Virginia on a similar question in the case of City of Norfolk v. Board of Supervisors, 168 Va. 606, 192 S.E.2d 588.

In the case of Montain v. City of Fargo, 38 N.D. 432, 166 N.W. 416, L.R.A.1918C, 600; this court held that disposing of garbage was a governmental function. We quote from the opinion, 38 N.D. at pages 442–443, 166 N.W. at page 417.

"If indeed, as has generally been held, the protection of the lives and property of its citizens from loss by fire is a governmental function, and to such an extent that the city is not liable for the negligence of its firemen either in putting out or failing to put out a fire, or for accidents while the engines and carts are going to and from fires, or of its servants in removing ashes, and inflammable material, how much less should the city be held liable for acts done in the seeking to protect its citizens from dangers which are much more insidious and extensive."

See also Moulton v. City of Fargo, 39 N.D. 502, 167 N.W. 717, L.R.A.1918D, 1108.

In the case of Hamilton v. City of Bismark, 71 N.D. 321, 300 N.W. 631, it was held that in constructing a sewer system a city acts in a governmental capacity, and is not liable for damages caused by an overflow of its sewers occasioned by extraordinary rains or floods.

Upon the record before us, and the authorities cited we conclude that the City of Devils Lake was exercising an essential governmental function when it acquired ownership of the water distributing system and took steps to improve and enlarge it sufficiently to meet the needs of its inhabitants. It follows, that the defendant city could not be held liable for the damages sustained by the plaintiffs and was therefore entitled to judgment notwithstanding the verdict.

The judgment of the district court is reversed and the case remanded with directions to dismiss the action.

GRIMSON, C. J., and MORRIS, JOHNSON and BURKE, JJ., concur.