No. 33,526

MARJORIE CLINTON, *Plaintiff*, v. THE STATE TAX COMMISSION OF THE STATE OF KANSAS, W. G. FINK, LESTER LUTHER and C. C. COGSWELL, *Defendants*.

(71 P. 2d 857)

Opinion filed September 20, 1937.

*Earle W. Evans, Jos. G. Carey* and *W. F. Lilleston,* all of Wichita, for the plaintiff.

*D. C. Hill,* of Wamego, *Ellis D. Bever* and *Tom Mustard,* both of Topeka, for the defendants.

The opinion of the court was delivered by

WEDELL, J.: This is an original proceeding in mandamus. The question is whether the compensation received by plaintiff, a single woman, as clerk and stenographer from four corporations, agencies created by the congress, to wit, The Federal Land Bank of Wichita, Federal Intermediate Credit Bank of Wichita, Production Credit Corporation of Wichita, and the Wichita Bank for Coöperatives, is taxable under the Kansas state income tax law.

Plaintiff's tax return for the year 1936 shows she received the following compensation:

| | |
|---|---:|
| The Federal Land Bank of Wichita | $777.00 |
| Federal Intermediate Credit Bank of Wichita | 166.50 |
| Production Credit Corporation of Wichita | 111.00 |
| Wichita Bank for Coöperatives | 55.50 |
| Total | $1,110.00 |

The tax is computed on net income.

The pertinent portion of G. S. 1935, 79-3205, provides:

". . . (b) Gross income does not include the following items which shall be exempt from taxation under this act: . . ."

". . . (9) salaries, wages or compensation paid by the United States to its officials or employees, including members of the army, navy and marine corps; . . ."

In making the return plaintiff claimed her employers were agencies and instrumentalities of the United States and hence her salary was not taxable by the state. The claim was denied. The tax commission contends plaintiff's compensation is not paid by the United States, but by the four corporations as such; the corporations are not engaged in the exercise of functions essentially governmental in character; the tax on plaintiff's salary does not constitute a serious interference, if any, with the purposes for which the agencies were created, and the congress did not intend to exempt plaintiff's salary from state taxation. On the other hand, plaintiff insists that under the doctrine of implied immunity as construed by the supreme court of the United States her salary is immune from state taxation.

The doctrine of implied immunity takes root in our dual system of state and federal government. It is based on the conception that the power of one government to tax the governmental functions of the other is the power to destroy it. It does not, however, necessarily follow that every operation which is in some manner related to government, is therefore essentially or inherently a governmental function. Moreover, every tax, irrespective of its nature, cannot be said to seriously interfere with the primary purpose for which an instrumentality is created. Governments, both state and federal, have greatly enlarged their respective fields of activity. The instant case presents only one of a constantly mounting number of new operations which have come to be regarded as having some relation to government. The social and economic wisdom of this tendency is not a matter of judicial, but one of legislative concern. It must, however, be obvious to the most casual observer that if the trend toward enlarged governmental activity continues with its present acceleration few fields of endeavor will remain entirely un-

related to governmental operations in one aspect or another. Clearly, there must be a limitation to the doctrine of implied immunity from taxation somewhere. Without such restriction it requires no vivid imagination to realize that huge sources of revenue would be entirely withdrawn from both state and federal governments. Without a practical application of the doctrine revenues would be seriously depleted, notwithstanding an ever-increasing demand for the discovery of new sources of revenue occasioned by unprecedented increases in the costs of government. It appears the farm-credit act of 1933 was enacted primarily for the purpose of providing a credit system for farmers under which they might obtain funds on more favorable terms and by means of which they might ultimately liquidate their indebtedness. It appears it was also designed to enable farm organizations to function in a manner which would more adequately protect the interests of the entire industry. An instructive review of the general relation of the four agencies here involved and the structure and plans of the farm-credit administration, may be found in the address of Henry Morgenthau, Jr., governor of the farm-credit administration, of June 14, 1933. (Congressional Record, vol. 77, part 6, pp. 6187-6188.) For general administrative provisions of the farm-credit administration, see 12 U. S. C. A., §§ 636-640, inclusive.

The doctrine of implied immunity from taxation must be given a practical and not a mechanical construction. (*Railroad Company v. Peniston,* 18 Wall. 5, 21 L. Ed. 787; *Metcalf & Eddy v. Mitchell,* 269 U. S. 514, 524, 46 S. Ct. 22, 70 L. Ed. 384; *Burnet v. A. T. Jergins Trust,* 288 U. S. 508, 516, 53 S. Ct. 439, 77 L. Ed. 925; *Tirrell v. Johnston,* 86 N. H. 530, 544, 171 Atl. 641.)

In the Tirrell case it was by the supreme court of New Hampshire declared:

"At some point the interference becomes too remote to warrant an application of the immunity which has been implied from the sovereign nature of the federal government. When that point is reached, the power of the state prevails." (p. 544.)

The supreme court of the United States affirmed the decision (293 U. S. 533, 55 S. Ct. 238, 79 L. Ed. 641) without opinion further than the citation of the following cases: *Alward v. Johnson,* 282 U. S. 509, 514, 51 S. Ct. 273, 75 L. Ed. 496; *Willcuts v. Bunn,* 282 U. S. 216, 225, 226, 51 S. Ct. 125, 75 L. Ed. 304; *Fox Film Corp. v. Doyal,* 286 U. S. 123, 128, 129, 52 S. Ct. 546, 76 L. Ed. 1010; *Susquehanna*

*Co. v. Tax Commission* (No. 1), 283 U. S. 291, 294, 51 S. Ct. 434, 75 L. Ed. 1042; *Indian Territory Oil Co. v. Board*, 288 U. S. 325, 327, 328, 53 S. Ct. 388, 77 L. Ed. 812.

In the Metcalf case, *supra,* it was said:

"But neither government may destroy the other nor curtail in any substantial manner the exercise of its powers. Hence, the limitation upon the taxing power of each, so far as it affects the other, must receive a practical construction which permits both to function with the minimum of interference each with the other; and that limitation cannot be so varied or extended as seriously to impair either the taxing power of the government imposing the tax (*South Carolina v. United States,* 199 U. S. 437, 461, 50 L. Ed. 261, 269, 26 Sup. Ct. Rep. 110, 4 Ann. Cas. 737; *Flint v. Stone Tracy Co.,* 220 U. S. 172, 55 L. Ed. 421, 31 Sup. Ct. Rep. 342, Ann. Cas. 1912 B, 1312) or the appropriate exercise of the functions of the government affected by it. (*Railroad Company v. Peniston,* 18 Wall. 5, 31, 21 L. Ed. 787, 791.)" (p. 524.)

The doctrine of implied immunity has inherent limitations. (*Educational Films Corp. v. Ward*, 282 U. S. 379, 51 S. Ct. 170, 75 L. Ed. 400; *Alward v. Johnson*, 282 U. S. 509, 51 S. Ct. 273, 75 L. Ed. 496; *Fox Film Corp. v. Doyal*, 286 U. S. 123, 52 S. Ct. 546, 76 L. Ed. 1010; *Federal Land Bank v. Priddy*, 295 U. S. 229, 55 S. Ct. 832, 79 L. Ed. 1408; *Helvering v. Powers*, 293 U. S. 214, 225, 55 S. Ct. 171, 79 L. Ed. 291.)

In *Fox Film Corp. v. Doyal,* supra, it was said:

"The principle of the immunity from state taxation of instrumentalities of the federal government, and of the corresponding immunity of state instrumentalities from federal taxation—essential to the maintenance of our dual system—has its inherent limitations. *It is aimed at the protection of the operations of government* (*McCulloch v. Maryland,* 4 Wheat. 316, 436, 4 L. Ed. 579, 608), and the immunity does not extend 'to anything lying outside or beyond governmental functions and their exertions.' (*Indian Motorcycle Co. v. United States,* 283 U. S. 570, 576, 579, 75 L. Ed. 1277, 1281, 1282, 51 S. Ct. 601.) Where the immunity exists, it is absolute, resting upon an 'entire absence of power' (*Johnson v. Maryland,* 254 U. S. 51, 55, 56, 65 L. Ed. 126, 128, 129, 41 S. Ct. 16), but it does not exist '*where no direct burden is laid upon the governmental instrumentality, and there is only a remote, if any, influence upon the exercise of the functions of government.*' (*Willcuts v. Bunn,* 282 U. S. 216, 225, 75 L. Ed. 304, 306, 71 A. L. R. 1260, 51 S. Ct. 125.)" (p. 128.) (Italics inserted.)

In *Educational Films Corp. v. Ward,* supra, the rule was stated thus:.

"This court, in drawing the line which defines the limits of the powers and immunities of state and national governments, is not intent upon a mechanical application of the rule that government instrumentalities are immune from taxation, regardless of the consequences to the operations of government." (p. 391.)

In the Alward case, *supra*, it was said:

"Nor do we think petitioner's property was entitled to exemption from state taxation because used in connection with the transportation of the mails. There was no tax upon the contract for such carriage; the burden laid upon the property employed affected operations of the federal government only remotely." (p. 514.)

In *Federal Land Bank v. Priddy*, supra, the court concluded as follows:

"In the present case it does not appear that the attachment would directly interfere with any function performed by petitioner as a federal instrumentality. We reserve the question whether a different result would be required if such an interference were shown." (p. 237.)

That the tax in the instant case is not a tax on the corporations—the instrumentalities themselves—is evident. That it does not cast a direct burden on their operations is equally clear. That the tax would actually hinder or seriously interfere with the efficient exercise of the purposes sought to be attained is not alleged. Moreover, in our opinion such a contention, if in fact made, could not well be maintained. The tax, if it in fact affected operations of the agencies at all, could do so only remotely. The motion for the writ, in effect, simply alleges the tax constitutes an interference with federal instrumentalities and an encroachment upon the sovereignty and supremacy of the United States, impliedly prohibited by the constitution of the United States. It was early held that unless the tax actually hindered or interfered with the efficient exercise of the purposes sought to be accomplished, the doctrine of implied immunity did not apply. (*Railroad Company v. Peniston*, supra; *Central Pacific Railroad v. California*, 162 U. S. 91, 119, 120, 16 S. Ct. 766, 40 L. Ed. 903.) In the instant case such interference does not appear.

As previously intimated, the doctrine of implied immunity has a further limitation. It is restricted to the protection of functions essentially governmental in character. In *Metcalf & Eddy v. Mitchell*, 269 U. S. 514, 46 S. Ct. 172, 70 L. Ed. 384, it was said:

"Just what instrumentalities of either a state or the federal government are exempt from taxation by the other cannot be stated in terms of universal application." (p. 522.)

"As cases arise lying between the two extremes, it becomes necessary to draw the line which separates those activities having some relation to government, which are nevertheless subject to taxation, from those which are immune. Experience has shown that there is no formula by which that line may be plotted

with precision in advance. But recourse may be had to the reason upon which the rule rests, and which must be the guiding principle to control its operation." (p. 523.)  (See, also, *Burnett v. A. T. Jergins Trust*, 288 U. S. 508, 53 S. Ct. 439, 77 L. Ed. 925.)

Of course, when the particular taxation does not violate the reasoning underlying the principle of immunity, namely, the protection of functions of government, the rule fails.  Obviously there is then no room for the application of the doctrine.  A government may not depart from functions essentially governmental in character and enter into fields of business inherently private in their nature and yet demand protection from taxation behind a shield of implied immunity.  Thus, in the case of *Helvering v. Powers*, 293 U. S. 214, 55 S. Ct. 171, 79 L. Ed. 291, it was said:

"The principle of immunity thus has inherent limitations.  (*Metcalf & Eddy v. Mitchell*, supra, pp. 522, 524; *Willcuts v. Bunn*, 282 U. S. 216, 225, 226; *Indian Motorcycle Co. v. United States*, supra, p. 576; *Fox Film Corp. v. Doyal*, 286 U. S. 123, 128; *Board of Trustees v. United States*, 289 U. S. 48, 59.)  And one of these limitations is that the state cannot withdraw sources of revenue from the federal taxing power by engaging in businesses which constitute a departure from usual governmental functions and to which, by reason of their nature, the federal taxing power would normally extend.  *The fact that the state has power to undertake such enterprises, and that they are undertaken for what the state conceives to be the public benefit, does not establish immunity.*  (*South Carolina v. United States*, 199 U. S. 437; *Flint v. Stone Tracy Co.*, 220 U. S. 107, 172; *Murray v. Wilson Distilling Co.*, 213 U. S. 151, 173; *Metcalf & Eddy v. Mitchell*, supra; *Indian Motorcycle Co. v. United States*, supra; *Ohio v. Helvering*, 292 U. S. 360, 368, 369.)  The necessary protection of the independence of the state government is not deemed to go so far."  (p. 225.)  (Italics inserted.)

In the case of *South Carolina v. United States*, 199 U. S. 437, 26 S. Ct. 110, 50 L. Ed. 261, the collection of an excise tax was upheld against agents who were dispensers of liquor for the state.  Pertinent facts appearing in the opinion are as follows:

"By several statutes, the state of South Carolina established dispensaries for the wholesale and retail sale of liquor, and prohibited sale by other than the dispensers.  The United States demanded the license taxes prescribed by the internal revenue act for dealers in intoxicating liquors, and the dispensers filed the statutory applications for such licenses.  The state, sometimes in cash and sometimes by warrant on its treasury, paid the taxes."  (p. 438.)

"The dispensers had no interest in the sales, and received no profit therefrom.  The entire profits were appropriated by the state, one half being divided equally between the municipality and the county in which the dispensaries were located, and the other half paid into the state treasury."  (p. 438.)

The state contended that if congress may tax the agents of the state, charged with the duty of selling intoxicating liquors, it, in effect, assumes a certain control of this police power, and thus may embarrass and even thwart the attempt of the state to carry on this mode of regulation. The court, in answering the contention, in part, said:

"The right of South Carolina to control the sale of liquor by the dispensary system has been sustained. (*Vance v. W. A. Vandercook Co.*, No. 1, 170 U. S. 438.) The profits from the business in the year 1901, as appears from the findings of fact, were over half a million of dollars. Mingling the thought of profit with the necessity of regulation may induce the state to take possession, in like manner, of tobacco, oleomargarine, and all other objects of internal-revenue tax. If one state finds it thus profitable, other states may follow, and the whole body of internal-revenue tax be thus stricken down.

"More than this. There is a large and growing movement in the country in favor of the acquisition and management by the public of what are termed public utilities, including not merely therein the supply of gas and water, but also the entire railroad system. Would the state, by taking into possession these public utilities, lose its republican form of government?

"We may go even a step further. There are some insisting that the state shall become the owner of all property and the manager of all business. Of course, this is an extreme view, but its advocates are earnestly contending that thereby the best interests of all citizens will be subserved. If this change should be made in any state, how much would that state contribute to the revenue of the nation?" (p. 454.)

The query was indeed pertinent. So, in the instant case, it may well be asked, from where shall states derive their revenue if the numerous federal agencies which are rapidly encroaching upon or eliminating taxable enterprises, are exempt from state taxation under a doctrine of implied immunity. The recent growth of federal agencies in various fields of business activity has been generally recognized as highly phenomenal. A mere glance at the number of federal agencies operating under the farm-credit act alone will suffice to illustrate the enormity of federal expansion into a single field of what has been ordinarily regarded as a sphere of private enterprise and subject to taxation by the states. Here we have provision under the 1933 farm-credit act alone for more than forty-eight huge federal corporations operating in the twelve federal land-bank districts of the nation. The effect on state revenues of this single federal expansion obviously is enormous. This fact will become increasingly apparent as we later review the various exemptions expressly granted.

While the South Carolina case involved dispensers of liquor as agents of the state, it has also been expressly held that a state itself is not immune from the excise tax imposed by the federal government where the state engages in the business of the sale of liquor. The decision was grounded on the principle that the state in so doing was not engaged in the performance of a governmental function but in the operation of private business. (*Ohio v. Helvering*, 292 U. S. 360, 54 S. Ct. 725, 78 L. Ed. 1307.)

The agencies involved in the instant case are not only engaged in operations which ordinarily have not been regarded as governmental functions, but the statutes prescribing their powers clearly clothe them with many characteristics of private corporations. The latter fact has likewise been regarded as significant in connection with the question of implied immunity. The former Federal Land Bank, created under the act of 1916, as to possessing characteristics of private corporations, was very similar to the present Federal Land Bank, now operated as a part of the 1933 farm-credit act. It will be well to bear in mind the former federal land bank was held to be a federal instrumentality. (*Smith v. Kansas City Title Co.*, 255 U. S. 180, 41 S. Ct. 243, 65 L. Ed. 577.) It was also held to possess some of the characteristics of a private corporation. (*Fed. Land Bank v. Gaines*, 290 U. S. 247, 54 S. Ct. 168, 78 L. Ed. 298.) The question of that bank's immunity from attachment and execution arose in the case of *Federal Land Bank v. Priddy*, supra. The precise question was whether immunity from attachment and execution was granted to the bank by implication. It was held such immunity was not so granted. In arriving at that conclusion, the court analyzed the provisions of the act which created the bank, and among other things, stressed the fact many of its characteristics were similar to those of private corporations. It said:

"The statute does not contemplate that their stock is to be wholly, or even chiefly, government owned. Its acquisition by private investors is permitted, § 5 [12 U. S. C. A., § 692] and its subscription by the borrowing national farm loan associations is compulsory, § 7 [12 U. S. C. A., § 721]. The operations of the federal land banks are, in part at least, for profit, § 5 [12 U. S. C. A., § 691 *et seq.*]. In the conduct of their business they may enter into contracts, § 4 [12 U. S. C. A., § 676], borrow money, receive interest and fees, § 13 [12 U. S. C. A., § 781], pay the expenses and commissions of agents, § 15 [12 U. S. C. A., § 804], and pay dividends on their stock, § 5 [12 U. S. C. A., § 694]. While they are required to deposit in trust farm mortgages as security for farm loan bonds, § 13 [12 U. S. C. A., § 781], they may acquire and dispose of prop-

erty in their own right, including land, § 13 [12 U. S. C. A., §781]. *They thus have many of the characteristics of private business corporations, distinguishing them from the government itself and its municipal subdivisions, and from corporations wholly government owned and created to effect an exclusively governmental purpose.* This is a circumstance which gives some support to the inference that the intended scope of the liability to suit includes judicial process incident to suit." (p. 232.) (Italics inserted.)

In conclusion it was said:

"In the present case it does not appear that the attachment would directly interfere with any function performed by petitioner as a federal instrumentality." (p. 237.)

We thus find the limitation on the doctrine of implied immunity, that is, the limitation as to remoteness of effect, clearly applied to an instrumentality of government which was held to be engaged in the exercise of an important governmental function, but which possessed many characteristics of private corporations. The present Federal Land Bank possesses numerous similar characteristics of private corporations. (12 U. S. C. A., § 694, 676 and 781, subdivisions 2, 4, 7, 9 and 14.)

That each of the three other agencies here involved likewise possesses many characteristics of private corporations is clear. Touching the Federal Intermediate Credit Bank, 12 U. S. C. A., § 1023 provides:

"Each federal intermediate credit bank shall have all the usual powers of corporations, and shall have power to sue and be sued both in law and equity, and for purposes of jurisdiction shall be deemed a citizen of the state where it is located."

As to the Production Credit Corporation and the Bank for Cooperatives, the pertinent portion of 12 U. S. C. A., § 1138, provides:

"The Central Bank for Coöperatives, and the Production Credit Corporations, the Production Credit Associations, and the Banks for Coöperatives, organized under the two preceding subchapters, shall have succession, until dissolved in accordance with this subchapter or any other act of congress; shall have power to sue and be sued in any court, to adopt and use a corporate seal, to make contracts, to acquire, hold, and dispose of real and personal property necessary and incident to the conduct of their business, to prescribe fees and charges (which in any case shall be subject to the rules and regulations prescribed by the governor) for loans and other services; and shall have such other powers necessary and incident to carrying out their powers and duties under this subchapter or any other act of congress as may be provided by the governor in their charters or in any amendments thereto."

Plaintiff, however, directs our attention to the fact that the four

agencies involved may be designated as depositaries, or financial agents of the federal government. True, the Federal Land Bank may be designated both as a governmental depositary and as a financial agent of the government. (12 U. S. C. A., § 701.) The three other agencies may be designated as fiscal agents of the government. (12 U. S. C. A., § 1024 and § 1138b.) It should, however, be noted that in the event federal deposits are made in federal land banks, satisfactory security is required therefor, and that security is likewise required for the faithful performance of its duty as a fiscal agent. (12 U. S. C. A., § 701.) Furthermore, the same statute expressly provides no deposits may be invested in mortgage loans or farm-loan bonds. It thus appears the operations of the agencies as a depositary or as a fiscal agency of the government must be maintained separate and distinct from their other operations. It should also be noted there is no showing any of these corporations have been designated as depositaries or fiscal agents or that plaintiff's services pertain in any manner to such governmental functions. Moreover, the possibility of these agencies being designated as depositaries or fiscal agents, or, for that matter, their actual designation as such, would not, in itself, relieve plaintiff from taxation. In *Choctaw, O. & G. R. R. Co. v. Mackey*, 256 U. S. 531, 536, 41 S. Ct. 582, 65 L. Ed. 1076, it was said:

"The mere fact that property is used, among others, by the United States as an instrument for effecting its purpose does not relieve it from state taxation. . . . And even though it be granted that the federal government utilized the railroad as an instrument in working out its policy toward the Indians, the tax upon the railroad property would be none the less valid." (See citations.) (pp. 536, 537.)

The case of *Helvering v. Powers*, 293 U. S. 214, 55 S. Ct. 171, 79 L. Ed. 291, is most enlightening. The specific issue was that of immunity from the federal income tax. The state of Massachusetts by statute provided for the public operation of the Boston Elevated Railroad Company. It was operated by a board of five trustees who were appointed by the governor. The trustees were not permitted to hold stock in the company. They were inducted into office as public officers and were made removable by the governor. The supreme court of the United States held that, notwithstanding the fact the trustees were administrative agents of the state, the enterprise was in its nature essentially a business enterprise, and the trustees were therefore not exempt from a federal income tax. In so holding, the

court again gave most careful consideration to the inherent limitations of the doctrine of implied immunity, cited many of its former decisions, and said:

"We see no reason for putting the operation of a street railway in a different category from the sale of liquors. In each case, the state, with its own conception of public advantage, is undertaking a business enterprise of a sort that is normally within the reach of the federal taxing power and is distinct from the usual governmental functions that are immune from federal taxation in order to safeguard the necessary independence of the state. If, in the instant case, the commonwealth had acquired the property of the company and had organized management of it in perpetuity by the state government, instead of temporarily, or had taken over all the street railways in all its cities for direct operation by the commonwealth, there would appear to be no ground, under the principles established by the decisions we have cited, for holding that this would effect the withdrawal of the enterprise from the federal taxing power. And the fact that the state has here undertaken public management and operation for a limited time, and under the particular restrictions of the agreement with the company, cannot be said to furnish a ground for immunity.

"If the business itself, by reason of its character, is not immune, although undertaken by the state, from a federal excise tax upon its operations, upon what ground can it be said that the compensation of those who conduct the enterprise for the state is exempt from a federal income tax? *Their compensation, whether paid out of the returns from the business or otherwise, can have no quality, so far as the federal taxing power is concerned, superior to\ that of the enterprise in which the compensated service is rendered.*

"We conclude that the congress had the constitutional authority to lay the tax." (p. 227.) (Italics inserted.)

The supreme court of Montana, in *Pomeroy v. State Board of Equalization,* 99 Mont. 534, 45 P. 2d 316, had occasion to pass upon the question whether an employee of the reconstruction finance corporation was an employee of the United States, and whether his salary was exempt from its state income tax law. Various decisions of the supreme court of the United States were analyzed, and it was held:

"An employee of the Reconstruction Finance Corporation, which, though an instrumentality of the government, is owned by it in its proprietary rather than in its governmental capacity, is not an employee of the United States within the meaning of the state income-tax law, above, section 7, in effect exempting salaries of federal officials and employees." (Syl. ¶ 4.)

Plaintiff urges she is an agent, an employee of the government, as all the stock of the Federal Intermediate Credit Bank is owned by the United States (12 U. S. C. A., § 1061). It is well to bear in mind that generally agents of a corporation are not agents of the stockholders. (*United States v. Strang,* 254 U. S. 491, 493, 41 S. Ct. 165,

65 L. Ed. 368; *Pomeroy v. State Board of Equalization*, supra.) Furthermore, this is not a tax on the corporate entity nor upon its stock. It is also worthy of note that the Federal Intermediate Credit Bank has power to borrow money and to issue and sell collateral trust debentures or similar obligations (12 U. S. C. A., § 1041), and that under provisions of 12 U. S. C. A., § 1043, the government of the United States shall assume no liability, directly or indirectly, for any such obligations issued.

In support of her contention of immunity plaintiff relies mainly upon *McCulloch v. Maryland*, 4 Wheat. 316, 4 L. Ed. 579; *Dobbins v. Erie County*, 16 Pet. 435, 10 L. Ed. 1022; *Osborn v. United States Bank*, 9 Wheat. 738, 6 L. Ed. 204; *Evans v. Gore*, 253 U. S. 245, 40 S. Ct. 550, 64 L. Ed. 887; *People of State of New York v. Graves*, 299 U. S. 401, 57 S. Ct. 269, 81 L. Ed. 202; *Brush v. Commissioner of Internal Revenue*, 300 U. S. 352, 57 S. Ct. 495, 81 L. Ed. 443.

The McCulloch and Osborn bank cases both involved taxation of an instrumentality of the banks; that is, taxation on the actual operations of the banks. In the Dobbins case it was held the office of Dobbins, he being an officer of the United States, namely, captain in the United States revenue cutter service, was not taxable by the state. In the Evans case it was held the net income of a United States district judge was not subject to a state income tax. In the Graves case it was held the fixed annual salary of relator, as general counsel for the Panama Railroad Company, was exempt from a state income tax. Concerning the real question at issue in the latter case, the court said:

"The question, therefore, to be answered is whether the *canal* is such an instrumentality of the federal government as to be immune from state taxation; and, if so, are the operations of the railroad company so connected with the *canal* as to confer upon the company a like immunity?" (p. 270.) (Italics inserted.)

The court reviewed the legislation authorizing the construction of the canal, the acquisition of rights connected therewith, including all the capital stock of the railroad. It reviewed the laws authorizing the president to govern and operate the Panama canal, and the canal zone, through a governor of the canal and other persons, and said:

"We need not particularize further. Chapter 6, title 48, U. S. C. (48 U. S. C. A., § 1301 *et seq.*), discloses a large body of laws passed by congress for the *government and control of the canal, and of both the Canal Zone and the railroad company as necessary adjuncts of the canal.*

"That under these laws, the creation, management, and operation of the

canal are all *governmental functions* and the laws well within the constitutional power of congress to provide for the *national defense* and to *regulate commerce* under the commerce clause of the constitution, does not admit of doubt." (Italics inserted.)

. . . . . .. . . . . . . .

"Such being the status of the canal, it requires no argument to demonstrate that all auxiliaries primarily designed and used to aid in its management and operation, and which have that effect, partake of its nature and are themselves coöperating regulators—or, perhaps more accurately speaking, constitute, with the canal, a single great regulator—of national and international commerce. And this, we think, is the effect of the interrelation of the railroad company's activities with the management and operations of the canal." (p. 271.)

In the Brush case the question presented was, whether the salary of petitioner as chief engineer of the Bureau of Water Supply in the city of New York was a part of his taxable income for the purposes of the federal income-tax law. The entire question turned and was decided upon the broad ground of whether the conservation and distribution of water, in a modern city, and for both public and domestic uses, in sufficient quantity and in a state of purity, is an essentially governmental function. It was said:

"For the modern city, such conservation and distribution of water in sufficient quantity and in a state of purity is as vital as air." (p. 498.)

The court emphasized the fact that where a function is inherently governmental, it is none the less so by reason of its recent beginnings. In commenting upon the importance of the public service rendered, it said:

" 'No higher police duty rests upon municipal authority,' this court said in *Columbus v. Mercantile Trust Co.*, 218 U. S. 645, 658, 31 S. Ct. 105, 109, 54 L. Ed. 1193, 'than that of furnishing an ample supply of pure and wholesome water for public and domestic uses.'

. . . . . . . . . . . .

"We conclude that the acquisition and distribution of a supply of water for the needs of the modern city involve the exercise of essential governmental functions, and this conclusion is fortified by a consideration of the public uses to which the water is put. Without such a supply, public schools, public sewers so necessary to preserve health, fire departments, street sprinkling and cleaning, public buildings, parks, playgrounds, and public baths, could not exist. And this is equivalent, in a very real sense, to saying that the city itself would then disappear." (p. 500.)

Having concluded plaintiff's salary is not exempt from taxation under the doctrine of implied immunity, we shall next direct our attention to statutes dealing specifically with the subject of taxation, in order to ascertain, if we may, the congressional intent on the sub-

ject. In that search we cannot start with the assumption that an intent to exempt salaries is disclosed by reason of the fact the corporations were designated as federal instrumentalities. Every federal instrumentality itself is not immune from taxation. In *Shaw v. Oil Corp'n,* 276 U. S. 575, 48 S. Ct. 333, 72 L. Ed. 709, it was said:

"There are some instrumentalities which, though congress may protect them from state taxation, will nevertheless be subject to that taxation unless congress speaks. (See *Goudy v. Meath,* 203 U. S. 146, 149; *Gromer v. Standard Dredging Co.,* 224 U. S. 362, 371; *Fidelity & Deposit Co. v. Pennsylvania,* 240 U. S. 319, 323; *Railroad Co. v. Peniston,* 18 Wall 5; *Choctaw, O. & G. R. R. Co. v. Mackey,* 256 U. S. 531, 537; *Central Pac. R. R. v. California,* 162 U. S. 91, 126.)" (p. 581.)

As to the federal instrumentalities here involved, the congress undertook the task of declaring specific exemptions. It did not speak on the important subject of exemptions of salaries, wages or compensation of officials or employees of any of these instrumentalities. Where the answer to the question of immunity is not made plain by the words of the statute, it becomes necessary to ascertain whether immunity is granted by implication. That requires a consideration of the nature and purpose of the instrumentalities. (*Shaw v. Oil Corp'n,* supra; *Federal Land Bank v. Priddy,* 295 U. S. 229, 55 S. Ct. 832, 79 L. Ed. 1408.) That subject has heretofore received our attention. But what about the intention of the lawmakers as reflected by the statutes on taxation?

We shall first consider the provisions for exemption affecting federal land banks and federal intermediate credit banks. 12 U. S. C. A., § 931, provides:

"Every federal land bank and every national farm loan association, including the capital and reserve or surplus therein and the income derived therefrom, shall be exempt from federal, state, municipal, and local taxation, except taxes upon real estate held, purchased, or taken by said bank or association under the provisions of sections 761 and 781 of this chapter. First mortgages executed to federal land banks, or to joint-stock land banks, and farm loan bonds issued under the provisions of this chapter, shall be deemed and held to be instrumentalities of the government of the United States, and as such they and the income derived therefrom shall be exempt from federal, state, municipal, and local taxation."

12 U. S. C. A., § 1111, being the tax-exemption provision for federal intermediate banks, provides:

"The privileges of tax exemption accorded under section 931 of this chapter shall apply also to each federal intermediate credit bank, including its capital,

reserve, or surplus, and the income derived therefrom, and the debentures issued under this subchapter shall be deemed and held to be instrumentalities of the government and shall enjoy the same tax exemptions as are accorded farm-loan bonds in said section."

The tax in the instant case is not a tax on either of the banks, their capital, reserve, surplus or the income derived therefrom. Certainly it is in no sense a direct tax on the corporation or its assets as such. It is a tax on the property of plaintiff, to wit, her income after it has been paid by the corporation which employed her. It appears a tax on mortgages, farm-loan bonds and debentures, was regarded as an interference with the vital purposes of the agencies and hence they and the income derived therefrom were exempt from taxation. The language contained in the act discloses the lawmakers were most circumspect in declaring what should be exempt from taxation. For that reason they expressly denominated mortgages and bonds and debentures as "instrumentalities of the United States," and declared them exempt from taxation. In view of such careful consideration, we are inclined to the view that salaries, wages or compensation of officials and employees were deliberately omitted from the enumeration of tax exemptions. The intention to subject to taxation property of the Federal Land Bank which did not interfere or tend to interfere with the execution of its essential purposes is further affirmatively disclosed by express provision for the taxation of real estate. (12 U. S. C. A., §§ 931, 933.) The tax in the instant case is in no sense discriminatory. It is required of all whose services differ in no essential character from those performed by plaintiff and no intention is disclosed to exempt her salary from taxation.

We shall next consider tax exemptions affecting the two remaining agencies, the Production Credit Corporation, and the Bank for Cooperatives. 12 U. S. C. A., § 1138c, provides:

"The Central Bank for Coöperatives, and the *Production Credit Corporations,* Production Credit Associations, and *Banks for Coöperatives,* organized under this chapter, and their obligations, shall be deemed to be instrumentalities of the United States, and as such, any and all *notes, debentures, bonds, and other such obligations issued* by such banks, associations, or corporations shall be exempt both as to principal and interest from all taxation (except surtaxes, estate, inheritance, and gift taxes) now or hereafter imposed by the United States or by any state, territorial, or local taxing authority. Such banks, associations, and corporations, their property, their franchises, capital, reserves, surplus, and other funds, and their income, shall be exempt from all

taxation now or hereafter imposed by the United States or by any state, territorial, or local taxing authority; except that any real property and any tangible personal property of such banks, associations, and corporations shall be subject to federal, state, territorial, and local taxation to the same extent as other similar property is taxed. The exemption provided herein shall not apply with respect to any Production Credit Association or its property or income after the stock held in it by the Production Credit Corporation has been retired, or with respect to the Central Bank for Coöperatives, or any Production Credit Corporation or Bank for Coöperatives, or its property or income after the stock held in it by the United States has been retired." (Italics inserted.)

Here again we find no intimation of intention to exempt salaries or compensation of employees from taxation. The intention clearly appears to have been to exempt from taxation the corporations as such, their operations and such property as in the judgment of the lawmakers was necessary in order to eliminate interference with the purpose of their creation. This statute likewise contains a detailed enumeration of things and instrumentalities which it was intended should be exempt. In the first sentence it will be observed that obligations of the corporations which were to be exempt were expressly restricted to instrumentalities such as notes, debentures and bonds *issued* by the agencies. Clearly the tax in the instant case is not a tax on the corporations as such, nor on notes, debentures or bonds *issued* by them. Here again, real estate and tangible personal property was made taxable to the same extent as other similar property is taxed. There is further evidence of legislative intent. The last sentence of this section provides for a termination of present exemptions, thus clearly disclosing those express exemptions were intended as only temporary in character.

That the subject of exemptions from taxation of the instrumentalities themselves and their operations received painstaking consideration by the congress, is obvious. That it did not expressly exempt salaries, wages or compensation of officials or employees is clear. That no intention of such exemption can be drawn by fair implication is equally certain. Moreover, language relied upon as creating exemptions from taxation must be strictly construed. (*Comm'rs of Miami Co. v. Brackenridge*, 12 Kan. 114; *Ottawa University v. Comm'rs of Franklin Co.*, 48 Kan. 460, 29 Pac. 599; *Stahl v. Educational Assoc'n*, 54 Kan. 542, 38 Pac. 796; *Pefly v. Reynolds, Sheriff*, 115 Kan. 105, 222 Pac. 121; *State, ex rel., v. Shawnee County Comm'rs*, 132 Kan. 233, 294 Pac. 915; *Providence Bank v. Billings & Pittman*, 29 U. S. 514 [4 Peters 514], 7 L. Ed. 939; *Bank of Com-*

*merce v. Tennessee,* 161 U. S. 134, 146, 16 S. Ct. 456, 40 L. Ed. 645; *Goudy v. Meath,* 203 U. S. 146, 27 S. Ct. 48, 51 L. Ed. 130.)

In the Ottawa University case it was said:

". . . Any person claiming immunity from the common burdens of taxation, which should rest equally upon all, must bring himself clearly within the exemption; and hence it is held that a provision creating an exemption should be strictly construed." (p. 464.)

In the Bank of Commerce case the supreme court of the United States stated the rule thus:

"There must be no doubt or ambiguity in the language used upon which the claim to the exemption is founded. It has been said that a well-founded doubt is fatal to the claim." (p. 146.)

The tax in the instant case is in no sense discriminatory. It rests equally upon all whose work differs in no essential character from that performed by plaintiff. Had congress intended to exempt plaintiff's salary from taxation, it must be assumed it would have employed appropriate language to accomplish that purpose, as it clearly did in other respects. We are forced to the conclusion the congress did not believe an income tax would interfere unduly, if at all, with the efficient exercise of the purposes for which the instrumentalities were created. From what has been said it follows the motion for the writ must be denied.

It is so ordered.