No. 34,116

THE STATE OF KANSAS, ex rel. LESTER M. GOODELL, County Attorney of Shawnee County, *Appellee,* v. THE SECURITY BENEFIT ASSOCIATION, and THE SECURITY BENEFIT HOME AND HOSPITAL ASSOCIATION, *Appellants;* J. GLEN DAVIS, T. D. WILLIAMS and ERNEST L. NEWMAN (*Defendants*).

(87 P. 2d 560)

Opinion filed March 4, 1939.

*Harry Ladbury, John L. Hunt, Margaret McGurnaghan, John H. Hunt, George M. Brewster,* all of Topeka, and *A. W. Fulton,* of Chicago, Ill., for the appellants.

*Hugh T. Fisher, Lester M. Goodell* and *Irwin Snattinger,* all of Topeka, for the appellee.

The opinion of the court was delivered by

HOCH, J.: The question here presented is whether under the provisions of the state constitution certain property in Shawnee county, Kansas, is exempt from taxation. Title to the property is held by the Security Benefit Home and Hospital Association. Also involved is the parent corporation, the Security Benefit Association. The state tax commission held that in most part the property is exempt. The district court held that none of it is exempt, and enjoined its removal from the tax rolls. The two associations appeal.

The provision of the constitution involved is found in article 11, section 1, and reads as follows:

"All property used exclusively for state, county, municipal, literary, educa-

tional, scientific, religious, benevolent and charitable purposes . . . shall be exempted from taxation."

It is unnecessary to recite in detail the various procedural steps which have been taken. Suffice it to say that in 1934 the county assessor placed the property on the tax roll; that in due time petition to have the property stricken from the tax roll was filed with the state tax commission, was duly heard, and in an order issued December 28, 1934, the commission found "that the property used for home, school and hospital services is used entirely for charitable and benevolent purposes and is therefore exempt from taxation"; that "the property used for agricultural purposes is not used exclusively for charitable and benevolent purposes and should therefore be taxed;" and directed the county clerk and county treasurer of Shawnee county to correct their records in harmony with such findings. Identification of the property held to be exempt and that held not to be exempt was made in the commission's order by reference to certain schedules which need not be given in detail here. On January 8, 1935, an action was commenced in the district court of Shawnee county by the state of Kansas, *ex rel.* Lester M. Goodell, county attorney of Shawnee county, plaintiff, v. J. Glen Davis, county treasurer, and T. D. Williams, county clerk, seeking to enjoin defendants from complying with the order of the commission. The petition was subsequently amended to include as defendants, Ernest L. Newman, successor to Williams, and the Security Benefit Association and the Security Benefit Home and Hospital Association. Various intervening motions were made and acted upon, the issue finally joined and the case tried, beginning on November 15, 1937. On May 16, 1938, the trial court gave judgment for the plaintiff, and permanently enjoined the defendants from obeying the commission's mandate, and assessing costs against the Security Benefit Association. Motion for new trial was made, overruled and appeal perfected.

Comprehensive briefs, ably prepared, have been furnished. But while various questions are well presented, the essential issue is, in fact, a narrow one. The question is not as to who owns the property, nor whether the property is *largely* used for benevolent and charitable purposes, but whether it is *exclusively used* for such purposes. If not so *exclusively* used the exemption provision of the constitution does not apply.

The first rule of law that confronts us is the well-established one

that exemptions are to be strictly construed; that where governmental burdens are imposed, and certain exemptions provided, those seeking relief from the burden must show that they clearly come within the terms of the statutory exemption. That principle has been stated in a long line of decisions by this and other courts. Many of them were collected and cited in a comparatively recent decision of this court in the case of *Clinton v. State Tax Commission,* 146 Kan. 407, 71 P. 2d 857:

"Moreover, language relied upon as creating exemptions from taxations must be strictly construed. (*Comm'rs of Miami Co. v. Breckenridge,* 12 Kan. 114; *Ottawa University v. Comm'rs of Franklin Co.,* 48 Kan. 460, 29 Pac. 599; *Stahl v. Educational Assoc'n,* 54 Kan. 542, 38 Pac. 796; *Pefly v. Reynolds, Sheriff,* 115 Kan. 105, 222 Pac. 121; *State, ex rel., v. Shawnee County Comm'rs,* 132 Kan. 233, 294 Pac. 915; *Providence Bank v. Billings & Pittman,* 29 U. S. 514, 4 Peters 514, 7 L. Ed. 939; *Bank of Commerce v. Tennessee,* 161 U. S. 134, 146, 16 S. Ct. 456, 40 L. Ed. 645; *Goudy v. Meath,* 203 U. S. 146, 27 S. Ct. 48, 51 L. Ed. 130.)" (p. 423.)

There are two associations—two corporations—involved. Let us get them straight at the outset. One is the Security Benefit Association—the parent association—which does a very large insurance business. The second is the Security Benefit Home and Hospital Association, an affiliated corporation, and the offspring of the first. The child was created by the parent for the primary purpose of providing its members with hospital services, homes for the aged and homes for children of members, deceased or incapacitated. We shall adopt the terms used by appellants and refer herein to the parent association as the insurance association, and to the child as the hospital association.

The insurance association was organized in 1892 under the provisions of the insurance code and was originally chartered under the name of the Knights and Ladies of Security. It has grown to great size, with more than $100,000,000 insurance in force and with certificate holders in more than three-fourths of the states. It is a fraternal association which issues a number of forms of insurance policies which provide various benefits in case of death, permanent disability, old age, etc. There is no need here to describe in detail its various policies or certificates. The objects of the association, as stated in article 1, section 2, of its constitution, are as follows:

"The objects of this association are (1) To unite both sexes in a fraternal beneficiary society for the sole benefit of its members and their beneficiaries and not for profit. (2) The promotion of benevolences, charity, social culture,

mental improvement, education, care for the sick and needy, and to establish and (or) maintain homes and hospitals for the benefit of the members, to aid members in obtaining employment, to assist each other in business, and to provide for the payment of death benefits in such amounts as may be authorized by the national council or the national executive committee, and may provide for benefits in case of temporary or permanent disability either as a result of disease, accident or old age, and may provide for monuments or tombstones to the memory of the deceased members and the payment of funeral benefits."

The hospital association was organized in 1917 by the insurance association for the purpose of operating the hospital, homes and other property here involved. Its charter, granted under the general corporation code, provided:

"That this corporation is organized not for profit and that the purposes for which it is formed are: to promote benevolences, charity, social culture, mental improvement and education and the care of the sick and needy, and to that end, to establish and maintain orphans' and old peoples' homes, a hospital or sanitarium and similar charities or benevolences for the care, support and education of homeless and orphaned children, for the care and maintenance of needy old people, for furnishing medical and surgical aid to the sick and injured, to provide for the proper burial of deceased dependent persons, all to be conducted and maintained as a charitable or benevolent institution."

Title to the property is held by the hospital association. It consists of approximately 545 acres of land, with a fine group of buildings located thereon, and lies about four miles west of Topeka, Kan. It would serve no purpose to describe the property in detail. The plant consists of a large hospital, old peoples' homes, homes and school for children and various buildings incidental thereto. The farm land, with dairy barns, etc., is operated in connection with the same projects.

Counsel discuss at some length the question of whether the two associations are separate and distinct. No doubt they are separate legal entities. The evidence clearly shows, however, that they are operated and maintained as an integral part of the same common plan and purpose. That worthy purpose is to provide life insurance, old age and disability benefits, and services, homes for the aged and for orphans, free or at low cost for their insurance policyholders who meet the prescribed requirements. Appellants concede that the hospital association was organized by the insurance association for the purpose of carrying on the home and hospital projects. They call attention to the fact that at that time the statutes did not authorize

fraternal insurance associations to carry on these projects, under their own charter, but that shortly thereafter the law was amended to permit it. Very little comment is required on this phase of the facts. There is here no imputation of bad faith in the organization of the hospital association, nor any question raised as to the worthy character of the enterprise. We repeat that the only question is whether the properties, operated as they are, are *used exclusively for benevolent and charitable purposes.*

That the operations of the hospital association are carried on and controlled by the insurance association as part of one general plan and program is abundantly established by the evidence. Let us examine the facts in four major aspects.

1. *Control.* The hospital association has no stockholders. Its bylaws provide that it shall be managed, controlled and directed by a board of trustees and that the national executive committee of the insurance association shall constitute perpetually the board of trustees. They further provide that the president and the secretary of the insurance association shall constitute the president and secretary-treasurer, respectively, of the hospital association. Under this provision such officers have for many years carried on the affairs of the hospital association without even formal election as its officers.

2. *Financial Support.* The home and hospital services are supported in most part from the general fund of the insurance association. Appellants summarize the evidence on this matter by stating that to the end of the year 1934 the hospital has been operated at a "loss" of approximately $972,946.45; the Old Folks' Home at a "loss" of approximately $192,098.04; and the Children's Home at a "loss" of approximately $228,615.50; making a total "loss" to January 1, 1935, of approximately $1,393,660. And appellants add, "we believe it is clear that these institutions have been operated at a loss since 1934." The "losses" for the year 1934 were given as approximately $57,000. By "losses" is meant the difference between receipts from inmates and patients and the cost of providing the services furnished to them. These "deficits" have been taken care of by appropriations from the general fund of the insurance association. The general fund is created principally out of the first year's contributions received from all members of the association and fifteen percent thereof after the first year and such other amounts as may be prescribed by the national executive committee. And why should the differences above referred to be called "losses" or "deficits"? By

their premium payments through the years the members have created the very fund to be made available for their benefit in case they become patients at the hospital or residents at the old folks' home. While officers may well claim credit if they protect the fund by economical management, as it is their duty to do, the fund in reality belongs to those whose payments created it. And if members claim their right to the benefits provided they do not thereby become objects of charity, and the official act of using the fund as intended to pay the "losses" cannot be classed as a benevolence.

Appellants contend that the insurance premiums and the loading charge from which the general fund is created are no higher than they would be if no home and hospital facilities were provided. The fact remains, however, that from that fund over a million and a quarter dollars had been taken by January 1, 1935, to help provide these facilities to members. It may be true, as counsel argue, that if this million and a quarter had not been paid out for that purpose it would simply have been spent for some other purpose. That argument holds no persuasion to alter the essential fact that the fund was created out of payments by policyholders. And it must be assumed that when the directors use the fund to carry on the home and hospital projects they are acting in the interest of the association members to whom the fund really belongs.

3. *Admission—Terms and Conditions.* Appellants urge that the insurance certificates themselves contain no provision giving right to receive the services of the homes and hospital; that certificate holders have no enforceable right to claim the hospital and home benefits, and that the insurance association has no corporate power to say who shall be admitted to the homes and hospital and upon what terms—that such regulations can only be adopted by the hospital association. The plain implication of this argument is that the officers of the hospital association—who, as we have seen, are the same persons who manage the insurance association—have the legal right, if they choose to exercise it, to adopt regulations denying to policyholders any home and hospital benefits not available on equal terms to outsiders. Assuming the legalistic correctness of that view, its nakedness from an ethical viewpoint is quite apparent when viewed in the light of representations made to prospective buyers of insurance by the insurance association and to which later reference will be made. Happily, however, the record does not show that any

such thing has happened. On the contrary, the regulations provide many and very substantial special benefits to insurance policyholders. After payment of an entrance fee of $10 and a payment of one dollar per day "the services of the hospital are absolutely free to any beneficiary member of the association, regardless of their financial condition, provided they have held membership for at least one year, and provided that they have not been in suspension within three months at time of applying for admission." After April 1, 1927, members were required to carry at least $1,000 protection in the insurance association to be eligible to the hospital benefits. Applicants for admission to the old folks' home must have been members of the insurance association for at least fifteen years and must be seventy years of age, must be in need and must assign their certificates to the hospital association. Having met the conditions for admission they are then "furnished board and lodging at no cost to them whatever." This is a right which they have earned by their payments through the years, and one which rightly is not available on equal terms to those who have not helped create the supporting fund. In order for children to be admitted to the home they must be orphans of deceased members or children of member parents who are disabled. "They then receive board and lodging, clothing and education without the payment of a single dollar to either the insurance association or the hospital association either by themselves, their deceased parents or by their next of kin or friends." Such privileges are properly not available on like terms to those outside the membership.

4. *Inducement to Secure Policyholders.* A great mass of evidence was introduced to show that the insurance association has offered the benefits of the homes and hospital as an inducement to membership. There is no imputation here that there was anything improper in doing that, but however laudable the purpose and the plan, the fact remains that continuously, consistently and persistently through the years the insurance association has used those benefits, offered free or at low cost, to members as an effective means of expanding its insurance business. These representations have been made in official leaflets, advertisements, magazine articles, resolutions and in many other ways. And in this program the two associations, manned by the same officers, have worked steadily together. The officers of the insurance association have transferred

to the hospital association funds collected from policyholders and then the same men, acting as officers of the hospital association, have adopted bylaws and rules which gave the policyholders the benefits promised them by the insurance association. To have done otherwise would have been a gross breach of faith. The fact that the two associations are separate legal entities does not obscure or alter the essential fact that they are operating together in furtherance of a common plan. On this phase of the matter a few typical quotations from association literature will suffice. From a resolution adopted by the insurance association and published in their official publication, *The Security News:*

"Resolved, That these organized charities, the grounds, buildings and equipment, *are the sole and exclusive property of the membership of The Security Benefit Association* and are being *conducted under a separate charter as a matter of convenience,* with our full knowledge and approval."

From an advertisement in the *Fraternal Monitor:*

"All members entitled to benefits of these charitable institutions without contributions additional to the regular assessment rates."

From an advertisement in the *Fraternal Age:*

"A full line of insurance certificates is issued providing protection to meet the demands of the times. . . . In addition, there is the Home and Hospital Farm near Topeka, Kansas. . . . These features compose the complete society, and our representatives find it advantageous to offer them with the membership contracts."

From a letter by the president to members:

"You have just become a part of the greatest fraternal beneficiary society in America. Not only have you secured *for your beneficiary the best of protection,* but for yourself you have secured the right to invaluable benefits. *Among these are the benefits of our hospital."*

From an advertisement in the *Fraternal Age:*

"Field workers have an advantage in representing the Security Benefit Association. They receive the willing coöperation and loyalty of the members in their community. They have the free service of the hospital to sell."

From the official rate book used by field men in soliciting insurance:

*"Our society is the only life insurance organization in America that gives its members a home for the aged and orphaned children of deceased members and hospital service for its members.* Put these facts before the prospect in a proper way and unless he 'knows' he will never be sick and never die he will be compelled to admit that it is the best insurance proposition ever offered him."

·From "Association Leaflets":

"A real fraternal society operating a mutual coöperative farm of more than 400 acres—an old folks' and orphans' home and a general hospital.

"All members entitled to benefits of these charitable institutions without contributions additional to the regular assessment rates."

From an advertisement in the *Fraternal Age:*

"The writing of life insurance is hard work these days. . . . The field workers of the Security Benefit Association are successful because they have the best of life insurance to offer, and, in addition, they supply the benevolent features that rightfully accompany home and family protection."

Countless representations of similar character might be quoted.

There remains little else in this case which calls for further comment. We have examined carefully all the contentions of appellants and find that they are resolved by our determination of the essential issue, already considered, or they are immaterial.

One such contention is that premiums paid by policyholders are no higher than those paid by many companies which offer no such home and hospital benefits. Assuming that to be true, it does not change the fact that these policyholders were offered such benefits and that their money was used to provide them.

Another contention is that the appropriations made from the general fund to the hospital association are absolute gifts, create no indebtedness and that therefore their use is entirely for benevolent and charitable purposes. This contention falls within the question of the relationship between the two associations, already considered.

The briefs discuss at some length the question of whether the insurance association is a benevolent and charitable institution. This question requires little attention, since appellants concede in their reply brief that it is not a charitable and benevolent institution within the meaning of the law. It is well settled that fraternal beneficiary societies, supported by payments from members in furtherance of their individual and mutual interests, are not to be classed as "charitable and benevolent" in character. This court so held in a case (*Fraternal Council of the Knights & Ladies of Security v. Phillips* [Shawnee County], 63 Kan. 799, 66 Pac. 1011) involving the very association of which the insurance association here is the corporate successor. The court there said, in part:

"Plaintiff classes itself as a fraternal beneficiary society, but it is conducted for the sole benefit of its members. Among its objects are the promotion of benevolence, charity, social culture, mental improvement, education, care

for the sick and needy. All of these purposes are confined to its members, and dependent upon the payment by them of the assessments as required by the bylaws. Beneficiary members get what is paid for and nothing more. If they cease to pay they cease to receive. . . .

"It is so much benefit paid because of so much and so many assessments paid. Its benevolence is purely of a commercial character. . . . In our minds, these characteristics exclude the plaintiff in error most positively from the list of those institutions exempted from taxation by the words of the statute." (pp. 803, 804, 805.)

Many supporting decisions were there cited from this and other jurisdictions. No further citations on the point are necessary here.

Appellants cite the case of *Nicholson v. Hospital Association*, 97 Kan. 480, 155 Pac. 920. The question in that case was whether an association maintained by the railroad company for the treatment of its employees while sick, and supported by the monthly contributions of all its employees, with benefits of the hospital available to employees free of charge, is liable for the negligence of the physicians and attendants in the absence of a showing that reasonable care has not been used in the employment of its physicians and attendants. The court held that the facts brought the association within the rule that "charitable institutions" are not so liable. Assuming that on the same issue of liability for negligence the hospital association here involved would be held to be a "charitable institution," such a finding would in no way be determinative on the issue here presented. We are not here determining whether the hospital association is a "charitable institution," but whether its property, operated as a part of the plan and program of the insurance association, is *used exclusively* for charitable and benevolent purposes.

Appellants stress the case of *Masonic Home v. Sedgwick County*, 81 Kan. 859, 106 Pac. 1082. That case involved the property of the Kansas Masonic Home in Sedgwick county, which consisted of buildings used as homes for Master Masons, their wives, widows and children, and children of Eastern Star members, a chapel used exclusively for religious purposes, and certain incidental personal property. The property was in no way used in connection with furthering any business such as the insurance business involved in this case. More than that, the court stated that it "seems to be admitted in the answer of defendants" that "the property of the plaintiff is used exclusively for benevolent and charitable purposes," and that "it seems to be contended by the defendants that, to be

exempt, property in this state used for benevolent and charitable purposes should not only be for the purposes of public charity, but that the provisions of section 1 of article 7 of the constitution excludes all institutions used for charitable purposes except such as are under the supervision of the state." (p. 863.) The court did not agree to that view. It is true that the court further found that the property was used exclusively for benevolent and charitable purposes, and said:

"All of the evidence indicates that the benefits extended to the inmates of the home are not extended in consideration of any payments made by the inmates or by their relatives, and that no person in any way connected with or related to any member of the Masonic fraternity in the state has any legal right to enter the home or to receive the charities therein extended. In other words, the evidence, without conflict, proves that the home is conducted as a pure charity, adding thereto educational and religious opportunities and advantages." (p. 869.)

We think the case is clearly distinguishable from the case at bar. No business or commercial features were involved. The managers of the Masonic Home were not using it in connection with the promotion of any business enterprise.

Appellants also cite the case of *Nuns of St. Dominic v. Younkin,* 118 Kan. 554, 235 Pac. 869. That case also has no controlling force here. It involved hospital property and a training school operated by the plaintiff as an independent institution. No dividends were declared or paid, all earnings were devoted exclusively to the maintenance of the institution, and the properties were not used in connection with the promotion of any other business.

We find no decision of this court precisely in point, but the decisions involving the tax exemption provision of the constitution are uniformly in line, we believe, with the decision reached in this case. Where any substantial use of the property, direct or indirect, has been shown which is not clearly within the purposes stated in the exemption provision, the property has been found taxable. (*Mason v. Zimmerman,* 81 Kan. 799, 106 Pac. 1005; *Manhattan Masonic Temple Ass'n v. Rhodes,* 132 Kan. 646, 296 Pac. 734; *National Council v. Shawnee County,* 63 Kan. 799, 66 Pac. 1011; *Lawrence Business College v. Douglas County,* 117 Kan. 436, 231 Pac. 1039; *State Tax Comm. v. Board of Education,* 146 Kan. 722, 73 P. 2d 49; *Lawrence Business College v. Gardner,* 145 Kan. 145, 64 P. 2d 63; *Vail v. Beach,* 10 Kan. 214; and *Washburn College v. Comm'rs of Shawnee Co.,* 8 Kan. 344.)

In the light of all the conditions and circumstances under which the property of the Security Benefit Home and Hospital Association is used and operated, in close connection with the insurance business of the Security Benefit Association and the special benefits made available to certificate holders, we cannot say that such property is used exclusively for charitable and benevolent purposes. Accordingly, it is not entitled, under the provisions of the constitution, to be exempted from taxation.

The judgment of the district court is affirmed.