VAN COTT v. STATE TAX COMMISSION OF UTAH et al.

No. 5902.   Decided May 6, 1938.   (79 P. 2d 6.)

Rehearing Denied July 6, 1938.

*W. Q. Van Cott,* of Salt Lake City, for plaintiff.

*Ned Warnock,* of Salt Lake City, for defendants.

FOLLAND, Chief Justice.

The question for determination is whether or not the plaintiff's salary as Agency counsel for the Salt Lake Agency of the Reconstruction Finance Corporation, hereafter called the RFC, and his salary as counsel for the Regional Agricultural Credit Corporation of Salt Lake City, hereafter called the RACC, are either of them or both taxable income for the purpose of the state income tax law. The answer will depend on the character of these corporations, as to whether they exercise essential governmental functions or not. In submitting his report of taxable income for 1935, plaintiff claimed exemption of his salary received from the RFC and RACC. The State Tax Commission made a finding of plaintiff's income and tax liability and required him to pay the tax on a net income which included the salaries in question. Plaintiff's petition for a redetermination of the proposed tax was denied by the Commission, and the case came here on certiorari.

Pertinent sections of the state income tax law are the following:

Section 80-14-2, R. S. Utah 1933, as amended by Laws 1935, c. 90, § 1:

"There shall be levied, collected and paid for each taxable year upon the net income of every resident of the state, a tax equal to the sum of the following:

"(1) One per cent of the first $1,000 of the amount of net income in excess of the credits against net income provided in section 80-14-7.

"(2) Two per cent of the next $1,000 of such excess amount.

"(3) Three per cent of the next $1,000 of such excess amount.
"(4) Four per cent of the next $1,000 of such excess amount.
"(5) Five per cent of the remainder of such excess amount."

Section 80-14-3 reads:

" 'Net income' means the gross income computed under section 80-14-4 less the deductions allowed by section 80-14-5."

In defining what constitutes "gross income," subsection (2) (g) of section 80-14-4, listing exemptions, reads as follows:

"(g) Amounts received as compensation, salaries or wages from the United States or any possession thereof for services rendered in connection with the exercise of an essential governmental function."

Under the last-quoted section, the taxpayer is entitled to exclude from his gross income, in order to arrive at the figure for his taxable net income, any salary from the United States for "services rendered in connection with the exercise of an essential governmental function." Plaintiff asserts that his salary as counsel for the two named corporations are exempt under that section. The nature of our constitutional system of a dual government— state and federal—is such as to impliedly deprive a state of the power to tax instrumentalities of the federal government, and likewise to prohibit the federal government from taxing instrumentalities of a state government, where these exercise essential governmental functions. While a state by statute might extend exemption beyond that required by the federal rule, it cannot provide for state taxation of United States instrumentalities or salaries declared by the United States Supreme Court to be exempt. The statute excluding governmental salaries, wages, and commissions for services rendered in connection with the exercise of an essential governmental function is a recognition of the rule of immunity announced by the Supreme Court of the United States, that "a state was without authority to tax the instruments, or compensation of persons, which the United States

may use and employ as necessary and proper means to execute its sovereign power." *New York ex rel. Rogers* v. *Graves*, 299 U. S. 401, 57 S. Ct. 269, 272, 81 L. Ed. 306. The limitation on the power of the federal government with respect to taxation of local or state officials has been defined in similar language. In *Brush* v. *Commissioner of Internal Revenue*, 300 U. S. 352, 57 S. Ct. 495, 496, 81 L. Ed. 691, 108 A. L. R. 1428, the Supreme Court, speaking through Mr. Justice Sutherland, in defining what is meant by the phrase "governmental functions," says:

"The phrase 'governmental functions,' as it here is used, has been qualified by this court in a variety of ways. Thus, in *South Carolina* v. *United States*, 199 U. S. 437, 461, 26 S. Ct. 110, 50 L. Ed. 261, 268, 4 Ann. Cas. 737, it was suggested that the exemption of state agencies and instrumentalities from federal taxation was limited to those which were of a strictly governmental character, and did not extend to those used by the state in carrying on an ordinary private business. In *Flint* v. *Stone Tracy Co.*, 220 U. S. 107, 172, 31 S. Ct. 342, 55 L. Ed. 389, [421], Ann. Cas. 1912B, 1312, the immunity from taxation was related to the essential governmental functions of the state. In *Helvering* v. *Powers*, 293 U. S. 214, 225, 55 S. Ct. 171, 79 L. Ed. 291, 295, we said that the state 'cannot withdraw sources of revenue from the federal taxing power by engaging in businesses which constitute a departure from usual governmental functions and to which, by reason of their nature, the federal taxing power would normally extend.' And immunity is not established because the state has the power to engage in the business for what the state conceives to be the public benefit. Id. In *United States* v. *California*, 297 U. S. 175, 185, 56 S. Ct. 421, 80 L. Ed. 567, 573, the suggested limit of the federal taxing power was in respect of activities in which the states have traditionally engaged.

"In the present case, upon the one side, stress is put upon the adjective 'essential,' as used in the *Flint* v. *Stone Tracy Co.* Case, while, on the other side, it is contended that this qualifying adjective must be put aside in favor of what is thought to be the greater reach of the word 'usual,' as employed in the Powers Case. But these differences in phraseology, and the others just referred to, must not be too literally contradistinguished. In neither of the cases cited was the adjective used as an exclusive or rigid delimitation. For present purposes, however, we shall inquire whether the activity here in question constitutes an essential governmental function within the proper meaning of that term; and in that view decide the case."

From these cases, the rule may be deduced that each government is denied the power to tax the essential governmental functions of the other, and this limitation of power has extended to salaries, wages, or compensation paid to officers or employees of the government itself or an instrumentality which it supports in the exercise of essential governmental functions. The reason for the rule and the difficulty in laying down a precise formula in advance is well stated in the Brush Case by Mr. Justice Sutherland, speaking for the court, as follows:

"So long as our present dual form of government endures, the states, it must never be forgotten, 'are as independent of the general government as that government within its sphere is independent of the States.' *Collector* v. *Day* [*Buffington* v. *Day*] 11 Wall. 113, 124, 20 L. Ed. 122, 125. And, as it was said in *Texas* v. *White*, 7 Wall. 700, 725, 19 L. Ed. 227, 237, and often has been repeated, 'the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government.' The unimpaired existence of both governments is equally essential. It is to that high end that this court has recognized the rule, which rests upon necessary implication, that neither may tax the governmental means and instrumentalities of the other. * * *

"We thus come to a situation, which the courts have frequently been called upon to meet, where the issue cannot be decided in accordance with an established formula, but where points along the line 'are fixed by decisions that this or that concrete case falls on the nearer or farther side.' * * *

"* * * *Metcalf & Eddy* v. *Mitchell*, 269 U. S. 514, 523, 46 S. Ct. 172, 70 L. Ed. 384, 392. In the case last named we had occasion to point out the difficulty, albeit the necessity, as cases arise within the doubtful zone, of drawing the line which separates those activities which have some relation to government but are subject to taxation from those which are immune. 'Experience has shown,' we said, 'that there is no formula by which that line may be plotted with precision in advance. But recourse may be had to the reason upon which the rule rests, and which must be the guiding principle to control its operation. Its origin was due to the essential requirement of our constitutional system that the federal government must exercise its authority within the territorial limits of the states; and it rests on the conviction that each government in order that it may administer its affairs

within its own sphere, must be left free from undue interference by the other.' "

It is necessary to the life of a government that its power of taxation be not unduly restricted. Hence, the courts have recognized that immunity should not be extended to all instrumentalities and their employees, but to such only as are engaged in performing essential governmental functions. The problem has become extremely difficult because of the modern trend of expansion of governmental activities. This movement is not alone in the federal government, but is noticeable in states and cities as well. Cities are extending their activities in the field of furnishing power and light as well as water to their inhabitants. States have undertaken to engage in the sale and distribution of intoxicating liquors formerly believed to be exclusively the function of private enterprise. *South Carolina* v. *United States,* 199 U. S. 437, 26 S. Ct. 110, 50 L. Ed. 261, 4 Ann. Cas. 737; *Ohio* v. *Helvering,* 292 U. S. 360, 54 S. Ct. 725, 78 L. Ed. 1307. The federal government has entered many new fields, using extensively the corporate medium, as for example: The United States Shipping Board Emergency Fleet Corporation, Federal Land Banks, Federal Intermediate Credit Banks, Tennessee Valley Authority, Production Credit Corporation; and many others in addition to the RFC and the RACC. Every year more people are employed in governmental or quasi governmental activities of the type mentioned, so that large sources of revenue are withdrawn from one or the other governments if these are immune from taxation, and the problem of raising tax revenue from salaries and wages becomes increasingly difficult. Likewise, the question whether one government has the power to tax the income of contractors who contract with the other government has given the courts much concern. In the latest decision on the subject, *Ernest K. James* v. *Dravo Contracting Co.,* 302 U. S. 134, 58 S. Ct. 208, 82 L. Ed. ____, 114 A. L. R. 318, decided December 6, 1937, the Supreme Court asserted a practical solution of the problem looking to the

preservation of the taxing power of the state as against a more logical application of the theory of immunity. In the Dravo Case, the question involved the validity of a state tax on the gross receipts of a contractor who contracted with the United States Government. After declaring that the tax in question was not laid on the government, its property or officers, nor upon a contract of the government, the court, speaking through Mr. Chief Justice Hughes, said (page 216) :

"The application of the principle which denies validity to such a tax has required the observing of close distinctions in order to maintain the essential freedom of government in performing its functions, without unduly limiting the taxing power which is equally essential to both nation and state under our dual system."

Referring to *Metcalf & Eddy* v. *Mitchell,* 269 U. S. 514, 46 S. Ct. 172, 70 L. Ed. 384, which held that earnings of a contractor with a political subdivision of a state were subject to the federal income tax, the court commented (page 219) :

"The pith of the decision in the case of *Metcalf & Eddy* v. *Mitchell* is that government bonds and contracts for the services of an independent contractor are not upon the same footing. The decision was a definite refusal to extend the doctrine of cases relating to government securities, and to the instrumentalities of government, to earnings under contracts for labor.

"The reasoning upon which that decision was based is controlling here. We recognize that in a broad sense 'the burden of federal taxation necessarily sets an economic limit to the practical operation of the taxing power of the states, and vice versa.' 'Taxation by either the state or the federal government affects in some measure the cost of operation of the other.' As 'neither government may destroy the other or control in any substantial manner the exercise of its powers,' we said that the limitation upon the taxing power of each, so far as it affects the other, 'must receive a practical construction which permits both to function with the minimum of interference each with the other; and that limitation cannot be so varied or extended as seriously to impair either the taxing power of the government imposing the tax * * * or the appropriate exercise of the functions of the government

affected by it.' *Metcalf & Eddy* v. *Mitchell*, supra, 269 U. S. 514, at pages 523, 524, 46 S. Ct. 172, 70 L. Ed. 384.

"We said further that the nature of the governmental agencies, or the mode of their constitution could not be disregarded in passing on the question of tax exemption, as it was obvious that an agency might be of such a character or so intimately connected with the exercise of a power or the performance of a duty by the one government 'that any taxation of it by the other would be such a direct interference with the functions of government itself as to be plainly beyond the taxing power.' And it was on that principle that 'any taxation by one government of the salary of an officer of the other, or the public securities of the other, or an agency created and controlled by the other, exclusively to enable it to perform a governmental function,' was prohibited. We concluded that a nondiscriminatory tax upon the earnings of an independent contractor derived from services rendered to the Government could not be said to be imposed 'upon an agency of government in any technical sense,' and could not 'be deemed to be an interference with government, or an impairment of the efficiency of its agencies in any substantial way.' Id., 269 U. S. 514, at pages 524, 525, 46 S. Ct. 172, 70 L. Ed. 384."

It will be noted that the court distinguished the case from those cases involving salaries of officers of the one government which cannot be taxed by the other, and also from "an agency created and controlled by the other, exclusively to enable it to perform a governmental function."

Again, in *Helvering* v. *Therrell*, 58 S. Ct. 539, 82 L. Ed. ____, decided February 28, 1938, the court held that the federal government had power to tax compensation paid to attorneys and others out of corporate assets for necessary services rendered in liquidation of insolvent corporations by a state officer under a state statute. The court made further declaration of the principle as follows (page 542):

"The Constitution contemplates a national government free to use its delegated powers; also state governments capable of exercising their essential reserved powers; both operate within the same territorial limits; consequently the Constitution itself, either by word or necessary inference, makes adequate provision for preventing conflict between them.

"Among the inferences which derive necessarily from the Constitution are these: No state may tax appropriate means which the United

States may employ for exercising their delegated powers; the United States may not tax instrumentalities which a state may employ in the discharge of her essential governmental duties—that is those duties which the framers intended each member of the Union would assume in order adequately to function under the form of government guaranteed by the Constitution.

"By definition precisely to delimit 'delegated powers' or 'essential governmental duties' is not possible. Controversies involving these terms must be decided as they arise, upon consideration of all the relevant circumstances. Notwithstanding discordant views which have sometimes arisen because of varying emphasis given to one or another of such circumstances, it is now settled doctrine that the inferred exemption from federal taxation does not extend to every instrumentality which a state may see fit to employ. Exemption depends upon the nature of the undertaking; it is cabined by the reason which under lies the inference."

As distinguishing factors, the court mentioned (page 543):

"The compensation of the taxpayers was paid from corporate assets—not from funds belonging to the state. No one of them was an officer of the state in the strict sense of that term. The business about which they were employed was not one utilized by the state in the discharge of her essential governmental duties. The corporations in liquidation were private enterprises; their funds were the property of private individuals."

The case of *New York ex rel. Rogers* v. *Graves,* supra, is in point, and we think decisive as to the rule of law applicable here. Rogers was general counsel for the Panama Railroad Company, a corporation created under the laws of New York for the purpose of building and operating a railroad across the Isthmus of Panama. Rogers reported his salary from the corporation in making his state tax return, but claimed it as exempt. The State Tax Commission required payment of the tax thereon, and it was paid under protest. The exemption was claimed on the ground that the Panama Railroad Company was a wholly-owned instrumentality of the United States, engaged in maintaining, operating, and protecting the Panama Canal; that as such the company was

exempt from state taxation, and also salaries paid its offi-. cers and employees were exempt. The court stated the problem to be (page 270) :

"In order to reach a correct determination of the question whether the railroad company is exercising functions of a governmental character, the railroad and ships are to be considered not as things apart, but in their relation to the Panama Canal; and it is clear that the railroad and ships, after the completion of the canal, continued to be used chiefly as adjuncts to its management and operation. The question, therefore, to be answered is whether the canal is such an instrumentality of the federal government as to be immune from state taxation; and, if so, are the operations of the railroad company so connected with the canal as to confer upon the company a like immunity?"

After reviewing the history and development of operations resulting in the building and operating of the Panama Canal, the court said (page 271) :

"That under these laws, the creation, management, and operation of the canal are all governmental functions and the laws well within the constitutional power of Congress to provide for the national defense and to regulate commerce under the commerce clause of the Constitution, does not admit of doubt. *California* v. *Central Pacific Railroad Co.*, 127 U. S. 1, 39, 8 S. Ct. 1073, 32 L. Ed. 150; *Luxton* v. *North River Bridge Co.*, 153 U. S. 525, 14 S. Ct. 891, 38 L. Ed. 808."

The court concluded (page 272) :

"The railroad company being immune from state taxation, it necessarily results that fixed salaries and compensation paid to its officers and employees in their capacity as such are likewise immune."

We have quoted extensively from the Brush, Graves, Therrell, and Dravo Cases because they contain the latest expressions of the Supreme Court of the United States with respect to three phases of the general problem; that is, taxation of salaries of a local officer by the federal government, of the gross income of a government contractor by the state, and of an employee of a corporate instrumentality of the government by a state. This leads us to an investigation of the character of the RFC and the RACC to determine

whether or not they are instrumentalities used to enable the federal government to perform governmental functions. Plaintiff in his brief states:

"The determination of the case, therefore, depends upon whether these corporations are of such a nature as to be considered in the same way as the United States itself."

The evidence is stipulated and there is no dispute as to the facts. The difference between the parties arises because of the different interpretations of the facts. Plaintiff contends that the corporations are instrumentalities of the government, engaged exclusively in performing governmental functions. The Tax Commission takes the view that the government by means of these corporations has entered the field of business, in that through them it is lending money for profit in competition with private banking and other lending agencies, and that their functions are not essentially governmental at all.

The RFC was created by Congress on recommendation of President Herbert Hoover, early in the period commonly called the depression. It was patterned after the War Finance Corporation which had been set up and used during the World War. The title to the act creating it is:

"An Act To provide emergency financing facilities for financial institutions, to aid in financing agriculture, commerce, and industry, and for other purposes." 47 Stat. 5, 15 U. S. C. A. § 601 et seq.

Its capital stock of $500,000,000 was all subscribed by the United States. The corporation is controlled by a board of directors, one of whom is the Secretary of the Treasury, and the other six members are appointed by the President with the advice and consent of the Senate. It has the same franking privilege for its mail as the various departments of the government, and plaintiff has continuously used that franking privilege in working for both this and the other corporation. It has the right to avail itself, free of charge, of information, services, officers, and employees of boards, com-

missions, and executive departments of the United States government. It is authorized, with the approval of the Secretary of Treasury, to issue its negotiable obligations, which are fully and unconditionally guaranteed by the United States, and if not paid such obligations are to be paid by the United States Treasury. It is authorized to act as a depositary of public moneys and to be employed as financial agent of the federal government. It was organized for a limited period, and its corporate life has been extended since by act of Congress. Its liquidation was provided for, and all balances remaining unexpended after payment of debts are to be paid into the United States Treasury.

Plaintiff testified that the Salt Lake Agency performed the functions of the corporation in the state of Utah, the eastern portion of Nevada, and the southern part of Idaho; that in traveling by train on business connected with the corporation he has paid and been allowed the reduced rates allowed government employees; that any profits made by the corporation would be the government's, and any losses would have to be paid by the government; that none of its stock had been owned or held by any person other than the United States government; that where the RFC became involved in litigation the United States was a party and the action brought in the joint names of the United States of America and the Reconstruction Finance Corporation. Mr. Van Cott testified, and his testimony is not questioned, that his salary is and has been paid by check drawn directly on the United States Treasury.

During the years 1932 and 1933, business was paralyzed and many institutions considered sound were hard pressed for funds to meet the ordinary demands of business. Banks and other credit institutions turned to the RFC for aid. The loans made were not of a type that could be or would be made by ordinary banking concerns.

The Supreme Court of the United States has not directly decided the question we are now considering. However, that court expressed itself respecting the character of the

RFC in *Baltimore National Bank* v. *State Tax Commission of Maryland*, 297 U. S. 209, 56 S. Ct. 417, 80 L. Ed. 586, as follows (418):

"The Reconstruction Finance Corporation was organized in 1932 to give relief to financial institutions in a national emergency and for other and kindred ends. Act of January 22, 1932, 47 Stat. 5, Act of July 21, 1932, 47 Stat. 709, 15 U. S. C., c. 14 [15 U. S. C. A., § 601 et seq.]. At the time of its creation and continuously thereafter the United States has been and is the sole owner of its shares. The purpose that it has aimed to serve is not profit to the government, though profit may at times result from one or more of its activities. The purpose to be served is the rehabilitation of finance and industry and commerce, threatened with prostration as the result of the great depression. We assume, though without deciding even by indirection, that within *McCulloch* v. *Maryland*, 4 Wheat. 316, 4 L. Ed. 579, a corporation so conceived and operated is an instrumentality of government without distinction in that regard between one activity and another."

In that case the court held that the United States statutes permitted taxation of national bank stock held by the RFC. The Congress, however, promptly passed an act making such stock held by the RFC nontaxable. It would seem to follow that the Reconstruction Finance Corporation is an instrumentality of government, exercising governmental functions.

As to the Regional Agricultural Credit Corporation, the same conclusion will follow. The Reconstruction Finance Corporation Act authorized the RFC to create a regional agricultural credit corporation in each of the twelve Federal Land Bank districts, the capital of which was to be subscribed by the RFC and paid for out of the unexpended balance of amounts which were allocated and made available to the Secretary of Agriculture under the RFC act. In 1933, the President of the United States transferred the jurisdiction of the RACC from the RFC to the Farm Credit Administration. Ever since that time the direction of the RACC has been under the Farm Credit Administration of the United States government. During the

years it has been in existence, the RACC has loaned a total of approximately $40,000,000 in Wyoming, Utah, Arizona, Idaho, Nevada, and California. The Salt Lake office has loaned approximately $20,000,000 of this amount. Most of this has been received back in liquidation, the proceeds of which go to the Treasury of the United States. The financing of the RACC has at all times been done by the RFC out of funds appropriated by Congress, which funds are in the Treasury of the United States. It has no funds of its own, and never has had. It has no bank account. Certain of its officials are authorized to draw on the Treasury of the United States. Its funds are allocated and appropriated each year by act of Congress. It is required to make up an advance budget for the fiscal year, and that is consolidated into the budget of the United States government. The plaintiff is paid out of such budget by checks drawn on the Treasury of the United States.

During the years 1932 and 1933, the RACC was largely engaged in loaning moneys to livestock raisers who had been in distressed circumstances. But early in 1934 the RACC ceased to make further loans, and since that time has been in liquidation. The proceeds of liquidation are deposited to the credit of the Treasurer of the United States in the Federal Reserve Bank. After the money reaches the Federal Reserve Bank, the RACC has no power to draw on the funds. If there is any profit derived from the operation of the RACC, it will go to the Treasury of the United States.

Respondent cites and relies on the cases of *Pomeroy* v. *State Board of Equalization*, 99 Mont. 534, 45 P. 2d 316, *Clinton* v. *State Tax Commission*, 146 Kan. 407, 71 P. 2d 857, and *Parker* v. *Mississippi State Tax Commission*, 178 Miss. 680, 174 So. 567, certiorari denied by U. S. Supreme Court, 58 S. Ct. 144, 82 L. Ed. _____. In the Pomeroy Case, the Montana court had before it the question of whether the salary of a RFC officer as part of his net income was subject to the state income tax. The case holds that the officers and employees of the RFC are not employees of the United

States, and that their salaries are not exempt from computation of gross income for taxation purposes under a statute providing that gross income for tax purposes does not include "salaries, wages and other compensations received from the United States by [or] officials or employees thereof." Laws Mont. 1933, c. 181, § 7 (2) (f). This case was decided May 4, 1935, which was prior to the decision of the Supreme Court of the United States in *New York ex rel. Rogers* v. *Graves,* supra, decided January 4, 1937, and before the decision in *Brush* v. *Commissioner of Internal Revenue,* supra, Mar. 15, 1937. We can hardly imagine that the Pomeroy Case would have resulted the same had the Supreme Court decisions in the Graves and Brush Cases been before the Montana court. The decision relies for authority on cases decided by the Supreme Court of the United States holding that employees of the United States Shipping Board Emergency Fleet Corporation are not agents of the government. *U. S. ex rel. Skinner & Eddy Corp.* v. *McCarl,* 275 U. S. 1, 48 S. Ct. 12, 72 L. Ed. 131; *United States* v. *Strang,* 254 U. S. 491, 41 S. Ct. 165, 166, 65 L. Ed. 368; *United States* v. *Walter,* 263 U. S. 15, 44 S. Ct. 10, 11, 68 L. Ed. 137; *The Lake Monroe,* 250 U. S. 246, 252, 39 S. Ct. 460, 63 L. Ed. 962; *Sloan Shipyards Corp.* v. *Fleet Corporation,* 258 U. S. 549, 42 S. Ct. 386, 66 L. Ed. 762; *Continental Illinois Nat. Bank & Trust Co.* v. *Chicago, R. I. & P. R. Co.,* 294 U. S. 648, 55 S. Ct. 595, 609, 79 L. Ed. 1110, 27 A. B. R., N. S., 715.

These cases, in the view of the Montana court, lend support to its conclusion. They were entirely ignored by the Supreme Court in its decisions in the Graves and Brush Cases in so far as the question here involved is concerned.

The case of *Clinton* v. *State Tax Commission,* supra, contains a well-written opinion holding that salaries of employees of the Federal Land Bank, Federal Intermediate Credit Bank, and Production Credit Corporation, and Bank for Co-operatives are subject to state tax. These corporations, while in a sense instrumentalities of government, can hardly be said to be exercising governmental functions. The

facts fixing their character distinguish them from the RFC and the RACC.

In the Parker Case, the Mississippi court held the salary of a vice president of the Federal Land Bank of New Orleans subject to state taxation. The Supreme Court of the United States, in denying certiorari, substantially held that that case was distinguishable from the Graves Case.

A case called to our attention by plaintiff since the argument herein is *Geery* v. *Minnesota Tax Comm.*, 278 N. W. 594, wherein the Minnesota court by a divided opinion held the salary of the governor of the Federal Reserve Bank of Minneapolis not subject to state tax.

It must be conceded there is a great deal of confusion in the cases, and that the line of demarcation is somewhat as expressed by Mr. Justice Sutherland in *Brush* v. *Commissioner of Internal Revenue*, (page 498) supra:

"We thus come to a situation, which the courts have frequently been called upon to meet, where the issue cannot be decided in accordance with an established formula, but where points along the line 'are fixed by decisions that this or that concrete case falls on the nearer or farther side.' *Hudson County Water Co.* v. *McCarter*, 209 U. S. 349, 355, 28 S. Ct. 529, 52 L. Ed. 828, 831, 14 Ann. Cas. 560. We are, of course, quite able to say that certain functions exercised by a city are clearly governmental—that is, lie upon the nearer side of the line—while others are just as clearly private or corporate in character, and lie upon the farther side. But between these two opposite classes, there is a zone of debatable ground within which the cases must be put upon one side or the other of the line by what this court has called the gradual process of historical and judicial 'inclusion and exclusion.' *Continental Illinois Nat. Bank & Trust Co.* v. *Chicago, R. I. & P. R. Co.*, 294 U. S. 648, 670, 55 S. Ct. 595, 79 L. Ed. 1110, 1125, [27 A. B. R. (N. S.) 715], and cases cited."

The Brush Case was decided by a concurrence of five of the justices; two additional justices concurring in the result because the exemption was within the terms of the exemption prescribed by Treasury Regulations 74, art. 643. A strong dissent was voiced by Mr. Justice Roberts on behalf of himself and Mr. Justice Brandeis. In the dissenting opinion is suggested the need for a more rational and practical rule

respecting taxability of salaries or compensation paid the officers of one government by the other (page 502) :

"It seems to me that the reciprocal rights and immunities of the national and a state government may be safeguarded by the observance of two limitations upon their respective powers of taxation. These are that the exactions of the one must not discriminate against the means and instrumentalities of the other and must not directly burden the operations of that other. To state these canons otherwise, an exaction by either government which hits the means or instrumentalities of the other infringes the principle of immunity if it discriminates against them and in favor of private citizens or if the burden of the tax be palpable and direct rather than hypothetic and remote. Tested by these criteria the imposition of the challenged tax in the instant case was lawful."

We cannot help thinking that the imposition of a tax on gross receipts of a government contractor, as in the Dravo Case, burdens the operations of the government as much or more than does a tax on income which includes a salary from a government instrumentality such as the RFC or the Federal Reserve Bank. It is interesting to note that the test suggested by Mr. Justice Roberts is quite in harmony with *McCulloch* v. *Maryland*, 4 Wheat. 316, 4 L. Ed. 579, in which case the doctrine of immunity had its birth. The test declared by the majority finds support in the later decisions of *Collector* v. *Day*, 11 Wall. 113, 20 L. Ed. 122; *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 429, 15 S. Ct. 673, 39 L. Ed. 759; *Id.*, 158 U. S. 601, 15 S. Ct. 912, 39 L. Ed. 1108; *Evans* v. *Gore*, 253 U. S. 245, 40 S. Ct. 550, 64 L. Ed. 887, 11 A. L. R. 519. The tax declared void in *McCulloch* v. *Maryland* was a stamp tax imposed on note issues of banks operating in the state but not chartered by the state. It was obviously a discriminatory tax imposed for the purpose of driving the Bank of the United States out of the state of Maryland. The decision of Mr. Chief Justice Marshall nevertheless upheld the uniform and nondiscriminatory state tax on the real estate and other property of the bank.

In view of the stand taken by the court in *James* v. *Dravo Contracting Company*, supra, and *Atkinson* v. *State*

*Tax Commission of Oregon,* 156 Or. 461, 62 P. 2d 13, 67 P. 161, holding the state tax on gross or net incomes of governmental contractors does lay an unconstitutional burden upon the federal government, we may anticipate that the doctrine of immunity for salaries of officials of the government or its instrumentalities may be re-examined and a different test applied more in harmony, with the suggestions of Mr. Justice Roberts. Until such is done, the states are bound by the decision of the Supreme Court in *New York ex rel. Rogers* v. *Graves, supra.* Our statute having made exempt salaries, wages, and compensation received "from the United States or any possession thereof for services rendered in connection with the exercise of an essential governmental function," we must decide this case under our statute in the light of the meaning of its terms as construed by the Supreme Court of the United States. The literature on the subject is most interesting. The following are cited as furnishing a basis for our suggestion that a re-examination of the doctrine by the United States Supreme Court is not to be unexpected: "Tax-Exempt Salaries and Securities: A Re-Examination," by Joseph L. Lewinson; American Bar Journal, September, 1937, p. 685; "Indirect Encroachment on Federal Authority by the Taxing Powers of the State," by Thomas Reed Powell, 31 H. L. R. 321. See, also, note, 36 H. L. R. 737; note, 44 H. L. R. 1141; note, 49 H. L. R. 1323; 47 H. L. R. 321; 50 H. L. R. 142; 51 H. L. R. 707.

We shall have to be content to follow, as we think we must, the doctrine of the Graves Case, until such time as a different rule is laid down by the courts, the Congress, or the people through amendment to the Constitution.

The order of the Tax Commission is hereby reversed, and the cause remanded to the commission, with instructions to redetermine the tax in accordance with the views herein expressed. Costs to plaintiff.

HANSON, MOFFAT, WOLFE, and LARSON, JJ., concur.